460 A.2d 237

Margaret McCLOSKEY (Widow), Harold G. McCloskey (Deceased), Appellant,

v.

WORKMEN'S COMPENSATION APPEAL BOARD and J.H. France Refractories, Inc. and Commonwealth of Pennsylvania, Appellees.

Supreme Court of Pennsylvania.

Argued Dec. 7, 1982.

Decided May 19, 1983.

96

George R. Klotzbaugh, Murrysville, for appellant.

James H. Horne, State College, for appellees.

Before O'BRIEN, C.J., and ROBERTS, NIX, LARSEN, FLAHERTY, McDERMOTT and HUTCHINSON, JJ.

## OPINION

McDERMOTT, Justice.

This is an appeal from a decision of the Commonwealth Court affirming an order of the Workmen's Compensation Appeal Board (hereinafter "Board") which reversed an award of benefits to appellant, Margaret McCloskey.[1]  58 Pa.Cmwlth. 29, 427 A.2d 288.

1. Jurisdiction is vested in this Court pursuant to the Act of July 9, 1976, P.L. 586, No. 142 § 2, 42 Pa.C.S.A. § 724(a).

Appellant filed a Fatal Claim Petition on December 4, 1974 alleging that the death of her husband, Harold McCloskey (hereinafter "deceased"), on the previous January 4, was the result of pneumoconiosis or silicosis, a lung disease allegedly contracted by the deceased during his employment with appellee, J.H. France Refractories, Inc., a brick manufacturing firm (hereinafter "employer"). The deceased worked as a green brick setter loading bricks in and out of kilns where the baking process occurred.

The employer contested appellant's claim on the basis of causation, arguing that the deceased died of a myocardial infarction or heart attack. Appellant countered that the deceased, during the entire period of his employment, was exposed to silica dust which caused him to develop silicosis, a scarring of the lungs condition that appellant contends contributed to the fatal heart attack.

Appellant presented before the Workmen's Compensation Referee the testimony of two medical experts, Drs. Dreibelbis and Hall who testified, essentially, that silicosis *may* have been among the causes of the decedent's death. The referee ruled in favor of appellant and the Board affirmed his findings on appeal as to causation, but remanded the case to the referee for recalculation of the award. The referee then complied with the Board's directives. In addition, he altered the original findings of fact. On appeal the Board cautioned the referee against making such alterations [2] and reversed its earlier position as

2. We must agree with the Board that the referee acted improperly not only because it altered the findings of fact without taking new evidence, but also because the power of the Board is preeminent in workmen's compensation proceedings. Accordingly, under circumstances such as these, where the Board's remand was solely for recalculation of the award, the referee should have confined his revisions to the stated purpose of the remand. To allow otherwise will condone a practice that would obfuscate administrative procedures under the Workmen's Compensation Act. *See* 77 P.S. § 854. *See also Borovich v. Colt Industries,* 492 Pa. 372, 424 A.2d 1237 (1981), (holding that a referee may make new findings of fact *when the Board has remanded the case for that purpose*). Contrary to the assertion of the Court below, *Borovich* does not allow the referee to

98

to causation.[3]  The Commonwealth Court affirmed this decision.

The Board and the Commonwealth Court relied upon the rationale of *Consolidation Coal Co. v. Workmen's Compensation Appeal Board,* 37 Pa.Cmwlth. 412, 391 A.2d 14 (1978). At the heart of this controversy is the question of whether *Consolidation Coal* properly interpreted § 301(c)(2)[4] of the Workmen's Compensation Act, which establishes the requirements appellant must meet in order to receive death benefits under the circumstances of this case.

Section 301(c)(2) provides as follows:

(2) The terms "injury," "personal injury," and "injury arising in the course of his employment," as used in this act, shall include, unless the context clearly requires otherwise, occupational disease as defined in section 108 of this act:  Provided, That whenever occupational disease is the

ignore its directives from the Board in remanded cases and act in whatever manner it deems appropriate.

**3.** Appellant observes that the Board reversed itself on the issue of causation in reliance upon *Consolidation Coal Co. v. Workmen's Compensation Appeal Board,* 37 Pa.Cmwlth. 412, 391 A.2d 14 (1978). Because this case represented a change in decisional law as to the relevant issue of causation and was decided between the referee's first award and the Board's reversal, appellant concludes that *Consolidation Coal* was improperly applied retroactively.

This argument is meritless.  It is well settled that changes in decisional law which occur during litigation will be applied to cases pending on appeal.  *Brubaker v. Reading Eagle Co.,* 422 Pa. 63, 221 A.2d 190 (1966); *Daniels v. State Farm Mutual Auto Insurance Company,* 283 Pa.Super. 336, 423 A.2d 1284 (1980); *Leland v. J.T. Baker Chemical Co.,* 282 Pa.Super. 573, 423 A.2d 393 (1980).  Moreover, the test as to whether a decision is applied prospectively or retroactively is whether it articulates a new and unforeshadowed rule of law. *Schreiber v. Republic International Corp.,* 473 Pa. 614, 375 A.2d 1285 (1977). *Consolidation Coal* did not articulate a new rule but merely relied upon a statutory interpretation which was not wholly without precedent.  It has long been held that such decisions are treated as relating back to the original statute because they are nothing more than interpretations of existing legislation.  *Buradus v. General Cement Products,* 356 Pa. 349, 52 A.2d 205 (1947); *Harry C. Erb, Inc. v. Shell Construction Co., Inc.,* 206 Pa.Super. 388, 213 A.2d 383 (1965).  Thus, appellant's retroactivity argument must fail.

**4.** Act of June 2, 1915, P.L. 736, Art. III § 301(c), *as amended* by Act of March 29, 1972, P.L. 159, No. 61 § 7, 77 P.S. § 411(2).

basis for compensation, for disability or death under this act, it shall apply only to disability or death *resulting from such disease* and occurring within three hundred weeks after the last date of employment in an occupation or industry to which he was exposed to hazards of such disease: And provided further, That if the employe's compensable disability has occurred within such period, his subsequent death as a result of the disease shall likewise be compensable. The provisions of this paragraph (2) shall apply only with respect to the disability or death of an employe *which results in whole or in part* from the employe's exposure to the hazards of occupational disease...

77 P.S. § 411(2) (emphasis supplied).

*Consolidation Coal,* stressing the words "resulting from", interpreted § 301(c)(2) as allowing benefits only in cases where the death was immediately caused by an occupational disease so as to preclude recovery where the disease merely contributed with other factors in causing death. Recognizing the harshness of its position, the court in *Consolidation Coal* observed as follows:

Although we are fully aware of the difficulty of obtaining medical evidence which unequivocally pinpoints the cause of death, particularly in cases in which the deceased suffered from a number of interrelated diseases, we believe that the Act requires medical evidence to be presented which establishes that a claimant's death *resulted from* an occupational disease, not simply that the disease was a contributing factor. Even if the result seems to be a harsh one, we may not judicially expand coverage of the Act by ignoring statutory language pertaining to qualification for benefits.

37 Pa.Cmwlth. at 422, 391 A.2d at 19.

This rationale as a standard for determining when the occupational disease results in death is an incomplete analysis of the statute.

■ It is obvious from the statute that the legislature did not fail to distinguish between results and causes, nor did it equate the two. Causes are not results since they may flow from numerous factors, some more directly than others. Consequently, § 301(c)(2) provides that death is compensable if it was caused "in whole or in part" by the occupational disease. The approach taken by *Consolidation Coal* is, therefore, not supported by the statute.

Other courts have recognized that where there are multiple causes of death, in addition to the immediate non-compensable cause, the determination as to whether one of these causes gives rise to compensation is based on an analysis of its contribution to the fatality. Thus, recovery is not precluded because the immediate cause of death was a heart attack or some other non-occupational disease, provided that an occupational disease existed among the secondary causes of fatality and that it was a substantial factor in bringing about death. *See Crucible Steel, Inc. v. Workmen's Compensation Appeal Board,* 65 Pa.Cmwlth. 415, 442 A.2d 1199 (1982); *Elliott v. Workmen's Compensation Appeal Board,* 57 Pa.Cmwlth. 70, 425 A.2d 885 (1981); *Hauck v. Workmen's Compensation Appeal Board,* 47 Pa.Cmwlth. 554, 408 A.2d 585 (1979).

These cases are more in accord with the plain meaning of § 301(c)(2), which recognizes, contrary to the rationale of *Consolidation Coal,* that death can be caused "in whole or in part" by an occupational diseases and still remain compensable. Therefore, *Consolidation Coal* set too stringent a standard. The more reasonable rule is articulated in *Crucible Steel* and its related line of cases.

■ The medical testimony required under § 301(c)(2) must be unequivocal in establishing the existence of the occupational disease as well as the causal connection between the disease and death. *See Wheeling Pittsburgh Steel Corp. v. Workmen's Compensation Appeal Board,* 61 Pa.Cmwlth. 544, 434 A.2d 853 (1981); *General Electric Co. v. Workmen's Compensation Appeal Board,* 61 Pa.Cmwlth. 511, 434 A.2d 841 (1981); *Lehigh Valley Manpower Program v.*

*Workmen's Compensation Appeal Board,* 61 Pa.Cmwlth. 430, 433 A.2d 935 (1981).

Therefore, we hold today that where there are multiple causes of death and the immediate cause was non-compensable, the requirements of § 301(c)(2) may be met by a showing with unequivocal medical evidence that the deceased suffered from an occupational disease and that it was a substantial, contributing factor among the secondary causes in bringing about death. Proving merely, as appellant contends, that the disease was or may have been a contributing factor is inadequate.

In the instant case, the immediate cause of death was a heart attack coupled with numerous contributing or secondary factors. The expert medical testimony failed to establish unequivocally that the occupational disease existed or that it was a substantial contributing cause of death.[5] Appellant thus failed to meet the requirements of § 301(c)(2).

Although we reject *Consolidation Coal* upon which the lower court relied, even under the less stringent standard we now adopt, appellant's claim must fail. There is no need, therefore, to remand this matter.

Accordingly, the order of the Commonwealth Court is affirmed.

FLAHERTY, J., files a concurring opinion.

ROBERTS, C.J., concurs in the result.

5. Appellant's expert Dr. Dreibelbis, testified that his identification of silicosis as a contributing factor in the deceased's death was merely a "supposition" made without the assistance of an X-ray. Deposition, W.H. Dreibelbis, M.D. 4/30/75 at 11. Appellant's other expert was certain only that silicosis *may* have been a factor in reducing the deceased's chances of surviving the fatal heart attack. Deposition, R.L. Hall, M.D., 1/19/77 at 11. Thus, there is a serious question as to whether appellant met her own liberal standard requiring only a showing that the disease was a contributing factor. Neither of her experts unequivocally established that silicosis contributed to the deceased's heart attack.

102

LARSEN, J., files a dissenting opinion.

O'BRIEN, former C.J., and HUTCHINSON, J., did not participate in the decision of this case.

FLAHERTY, Justice, concurring.

I concur in the result reached by the majority on this record. The pertinent testimony of Dr. Hall is as follows:

Q. Could you tell us how long he was a patient of yours?

A. I'd say approximately nine years.

. . . . .

Q. And, tell us, please, doctor, basically the nature of the treatments or the nature of the problems that Mr. McCloskey was having.

A. His problems involved recurrent chest infections, chronic obstructive pulmonary disease related to emphysema and silicosis.

. . . . .

Q. Now in your letter, doctor, to Attorney Cimino . . . you said to him 'it is also my opinion that the obstructive pulmonary emphysema and silicosis was a major contribution to his death.'

A. Right.

Q. Alright. Although he died basically of a myocardial infarction. Could you please explain what you mean by what nature of silicosis was a major contribution to his death.

A. We were certain that Mr. McCloskey did have pneumoconiosis and the chronic obstructive pulmonary disease. Also, he had had angina at least for five or six years. I suspect it was possibly the acute myocardial infarction that caused his death, but we know that if a patient does have a heart attack or an acute myocardial infarction, that if he does have any evidence of chronic obstructive pulmonary disease or pulmonary emphysema, that his blood gases usually indicate that the oxygen concentration in the blood stream is usually decreased to varying de-

grees. But, we also know that if a patient does have acute myocardial infarction—a patient with chronic obstructive pulmonary disease makes the ability to survive much more difficult because of a lack of oxygen, the injury to the heart muscle due to the thrombosis in the coronary artery be the amount of damage the heart muscle is directly related to how much oxygen gets into that tissue, and if a patient does have the chronic obstructive pulmonary disease superimposed on coronary artery disease, it will—they'll do very badly with having any evidence of an acute myocardial infarction, so I felt that his lung disease was an important contributing factor to his death when he died in 1974. We know that with any patient with a heart attack, if their lungs are normal their chances of surviving are much better than if they have any degree of chronic obstructive pulmonary disease.

Q. Silicosis or the general classification of pneumoconiosis, silicosis would be considered a chronic obstructive pulmonary disease.

A. Right.

.    .    .    .    .

Q. I understand your testimony to be that the possibility of his survival is decreased because he has this silicosis condition.

A. Right. The possibility of his surviving the heart attack when he had it there was decreased because of that silicosis, in that the prime thing is the amount of oxygen supplied to the heart muscle that gingered, and if they have the chronic obstructive pulmonary disease, the oxygen concentration getting into that heart muscle is decreased much more than just the heart attack. So, it really aggravates the infarction and heart attack markedly.

Q. There's no way that you can tell, though, whether he would have survived independent of the silicosis condition?

A. No, there's no way.

Q. So, he could have expired had he not had silicosis.

A. Yes, he could have.

Q. And then, *there's no way that you can tell with a reasonable degree of medical certainty that the silicosis was the cause of death.*

A. *No,* but *it was a markedly contributing factor* to the death because of the damage that had been done to the lungs. . . .

Q. It was a contributing factor in the sense that it decreased his possibility of survival of the myocardial infarction?

A. Right. And probably with an anoxia like that, the extent of the injury of the heart muscle would be larger.

The medical testimony is that silicosis was not the cause of death; rather the testimony describes silicosis as a condition which can operate to impair the ability to recover from a myocardial infarction. The record is devoid of any unequivocal medical testimony establishing a causal connection between the occupational disease, silicosis, and McCloskey's death.

The legislative language which governs is:

[W]henever occupational disease is the basis for compensation, for disability or death under this act, it shall apply only to disability or death *resulting* from such disease. . . . The provisions of this paragraph (2) shall apply only with respect to the disability or death of an employe which *results* in whole or in part from the employe's exposure to the hazard of occupational disease. . . .

Act of June 2, 1915, P.L. 736, art. III, § 301(c), as amended, 77 P.S. § 411(2) (Supp.1982–1983). The meaning of "result" is quite clear in its common usage: To result is "to proceed, spring or arise as a consequence, effect, or conclusion," Webster's Third New International Dictionary 1937 (1976). "*Result* is consequence that connotes end or conclusion; it is consequence, therefore, that achieves. Derivatively *result* means leap back; it contains something of the idea of proving or checking or calculating." John Baker Opdycke, Mark My Words, a Guide to Modern Usage and Expression 210 (1949). "Result" implies effect from a previous *cause,*

*Id.* at 258, not simply an event which follows, and "contributory factors" are not synonymous with causes. A reading of the statute, giving the plain meaning to the words chosen by the General Assembly, leads me inescapably to the conclusion that the Commonwealth Court correctly affirmed the Board's determination that the referee's decision on causation was not supported by the medical evidence of record. "The proper test for the legal sufficiency of expert medical testimony on the issue of causation is that the expert must testify that in his professional opinion the result in question came from the cause alleged." *Crucible Steel, Inc. v. W.C. A.B.,* 65 Pa.Commonwealth Ct. 415, 420, 442 A.2d 1199, 1202 (1982). In *Crucible,* supra, medical testimony that silicosis was "the most significant cause" of death met the statutorily prescribed burden of proof. In contrast, medical testimony that an occupational disease was a "substantial contributing factor", at 241, a "major contributing factor," "contributed in a substantial or significant manner," or "contributed to and accelerated" the employe's death simply is not sufficient to prove the death "result[ed] in whole or in part from the employe's exposure to the hazard of occupational disease." *Crucible Steel,* supra, 65 Pa.Cmwlth. at 418, 442 A.2d at 1201, and cases cited therein. Thus, where, as here, the medical expert testifies that the occupational disease was "a markedly contributing factor to the death," such testimony falls short of the standard prescribed by the Act.

LARSEN, Justice, dissenting.

I agree with the majority's rejection of the Commonwealth Court's standard for determining when death "results from" an occupational disease under section 301(c)(2) of the Workmen's Compensation Act (the Act), 77 P.S. § 411(2), which standard was first articulated in *Consolidation Coal Co. v. Workmen's Compensation Appeal Board (WCAB),* 37 Pa.Commw. 412, 391 A.2d 14 (1978). However, I cannot subscribe to the majority's interpretation of section 301(c)(2) under the circumstances presented by this case or the holding that, where an occupational disease exists among the secondary (or non-immediate) causes of death,

the requisite causal connection between death and the disease can only be met by "a showing with unequivocal medical evidence that the deceased suffered from an occupational disease and that it was a substantial, contributing factor among the secondary causes in bringing about death [and not] merely . . . a contributing factor. . . ." Majority slip opinion at 6.

The specific issue in this case is whether Mr. McCloskey's death "resulted from" an occupational disease within the meaning of the Act where the medical testimony is that the disease was a contributing factor in that it markedly decreased decedent's chances of surviving a myocardial infarction. I would hold that "sufficient competent evidence", 77 P.S. § 834,[1] exists on the record to support the referee's findings that decedent suffered from silicosis (and pneumoconiosis), and his finding that silicosis was a "significant, contributing causative factor" in Mr. McCloskey's death, and that such findings demonstrate the requisite causal connection between the death and the occupational disease, *i.e.,* death "resulted from" the occupational disease within the meaning of section 301(c)(2).

Under the Act, compensation is available for claimants or their dependents for personal injury to the employee or for death by an injury in the course of employment. 77 P.S. § 431. Section 301(c)(1), 77 P.S. § 411(1) provides, in relevant portion:

The terms "injury" and "personal injury," as used in this act, shall be construed to mean an injury to an employe, *regardless of his previous physical condition,* arising in the course of his employment and related thereto, and such disease or infection as naturally results from the injury *or is aggravated, reactivated or accelerated by the injury;* and wherever death is mentioned as a cause for compensation under this act, it shall mean only death resulting from such injury and its resultant effects, and

1. Section 834 provides, in relevant portion, "all findings of fact shall be based upon sufficient competent evidence to justify same."

occurring within three hundred weeks after the injury. (emphasis added).

In 1972, section 301(c)(2) was added, 77 P.S. § 411(2), which provision embraced occupational diseases within the "injury" concept. That section provides, in relevant portion:

The terms "injury," "personal injury," and "injury arising in the course of his employment," as used in this act, shall include, unless the context clearly requires otherwise, occupational disease as defined in section 108 of this act [2] Provided, That *whenever occupational disease is the basis for compensation, for disability or death under this act, it shall apply only to disability or death resulting from such disease* and occurring within three hundred weeks after the last date of employment in an occupation or industry to which he was exposed to hazards of such disease: And provided further, That if the employe's compensable disability has occurred within such period, his subsequent death as a result of the disease shall likewise be compensable. The provisions of this paragraph (2) shall apply only with respect to the disability or death of an employe which results in whole or in part from the employe's exposure to the hazard of occupational disease after June 30, 1973 in employment covered by the Pennsylvania Workmen's Compensation Act. (emphasis added).

In determining whether death resulted from an occupational disease within the meaning of section 301(c)(2), 77 P.S. § 411(2), several salient principles guide our interpretation. The overriding consideration is the remedial nature and humanitarian objectives of the Act which require liberal construction of its scope and application. *Krawchuk v. Philadelphia Electric Co.*, 497 Pa. 115, 120, 439 A.2d 627 (1981); Statutory Construction Act of 1972, 1 Pa.C.S.A. § 1928(c) (pamphlet 1982–83). This Court has held that an injury need not be the sole or exclusive cause of the disabili-

2. Section 108(k), 77 P.S. § 27.1(k), under which compensation was awarded by the referee, provides: "The term 'occupational disease,' as used in this act, shall mean only the following diseases.... Silicosis in any occupation involving direct contact with, handling of, or exposure to the dust of silicon dioxide."

ty, *Halaski v. Hilton Hotel,* 487 Pa. 313, 319, 409 A.2d 367 (1979), nor, as the majority acknowledges, does an injury or occupational disease need to be the sole or exclusive cause of death. *E.g., Elliott v. WCAB,* 57 Pa.Commw. 70, 425 A.2d 885, 887 (1981). Moreover, it is sufficient under the Act if the injury (including an occupational disease) "aggravates, reactivates or accelerates" a preexisting condition which preexisting condition was the immediate or primary cause of disability or death. *See* 77 P.S. § 411(1), *WCAB v. Bernard S. Pincus Co.,* 479 Pa. 286, 388 A.2d 659 (1978) *and Halaski v. Hilton Hotel, supra* at 487 Pa. 318–19, 409 A.2d 367 ("it is sufficient if the injury materially contributed to the disability, rather than the disability resulting from the natural progression of the preexisting condition.")

Of particular importance to our determination is the principle enunciated by this Court in *Hamil v. Bashline,* 481 Pa. 256, 392 A.2d 1280 (1978) and consistently followed in medical malpractice cases. *See Jones v. Montefiore Hospital,* 494 Pa. 410, 431 A.2d 920 (1980) *and Gradel v. Inouye,* 491 Pa. 534, 421 A.2d 674 (1980). In *Hamil v. Bashline, supra,* a medical malpractice case sounding in negligence, the immediate cause of decedent's death was a myocardial infarction. The basis of the complaint was that the defendants, a hospital and medical personnel associated with the hospital, had failed to properly diagnose and treat the decedent's condition in a manner which might have prevented his death. Decedent had gone to the hospital for treatment upon experiencing severe chest pains. Plaintiff's expert medical witness offered his professional opinion that decedent's chances of surviving the myocardial infarction were substantially decreased by defendants' negligence. Defendant's expert witness opined that death was imminent and would have occurred even if defendants' treatment had not been negligent.

Defendants argued their negligence did not *cause* the myocardial infarction even though it *may* have increased the risk of harm to the decedent. Relying on section 323(a) of the Restatement (Second) of Torts, Negligent Performance

of Undertaking to Render Services,[3] this Court rejected defendants' narrow theory of causation, and at 484 Pa. 269, 273, held:

> We agree with the view of the Superior Court majority expressed in *Bashline I* that the effect of § 323(a) is to relax the degree of certitude normally required of plaintiff's evidence in order to make a case for the jury as to whether a defendant may be held liable for the plaintiff's injuries: Once a plaintiff has introduced evidence that a defendant's negligent act or omission increased the risk of harm to a person in plaintiff's position, and that the harm was in fact sustained, it becomes a question for the jury as to whether or not that increased risk was a substantial factor in producing the harm.
>
> . . . .
>
> In light of our interpretation of Section 323(a), it follows that where medical causation is a factor in a case coming within that Section, it is not necessary that the plaintiff introduce medical evidence—in addition to that already adduced to prove defendant's conduct increased the risk of harm—to establish that the negligence asserted resulted in plaintiff's injury. Rather, once the jury is apprised of the likelihood that defendant's conduct resulted in plaintiff's harm, that Section leaves to the jury, and not the medical expert, the task of balancing probabilities. In so saying we do not intend to undermine the well-established standard of "reasonable degree of medical certainty" as the accepted norm for medical opinions on causation. But we think it would be unreasonable and unrealistic in this type of case to expect a physician to state with a "reasonable degree of medical certainty" what *might* have happened when the law (Section 323(a))

**3.** Section 323(a) provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

recognizes the contingencies involved. See generally D. Danner and E. Segall, Mediocolegal Causation: A Source of Professional Misunderstanding, 3 Am.J.L. & Med. 303 (1978). Where there is at issue the adequacy of medical services rendered in a fact situation to which Section 323(a) applies, therefore, a *prima facie* case of liability is established where expert medical testimony is presented to the effect that defendant's conduct did, with a reasonable degree of medical certainty increase the risk that the harm sustained by plaintiff would occur.

This Court further held, in *Jones v. Montefiore Hospital, supra* at 494 Pa. 416, 431 A.2d 920:

Proximate cause is a term of art, and may be established by evidence that a defendant's negligent act or failure to act was a *substantial factor* in bringing about the harm inflicted upon a plaintiff. Pennsylvania law has long recognized that this *substantial factor* need not be, as the trial court incorrectly charged, the only factor, *i.e., "that cause* which ... produces the result." (citations omitted) A plaintiff need not exclude every possible explanation, and "the fact that some other cause concurs with the negligence of the defendant in producing an injury does not relieve defendant from liability unless he can show that such other cause would have produced the injury independently of his negligence." *Majors v. Brodhead Hotel,* 416 Pa. at 273, 205 A.2d at 878.

It is inconceivable to me that this Court would adopt a stricter standard of causation in workmen's compensation cases than in medical malpractice cases decided under Section 323(a) of the Restatement. That section recognizes a higher duty on the part of one undertaking to render services which justifies a relaxation of the ordinary negligence standards of causation. Surely the statutory and moral obligation of an employer to his employee's to provide safe conditions and working environment justifies no more stringent a standard under the Workmen's Compensation

Act, especially in light of the liberal construction which we must give the Act.

The "resulting from" language of Section 301(c)(2), 77 P.S. § 411(2), surely does not preclude a referee's finding of a causal connection between disability or death and injury (including an occupational disease) where the medical testimony establishes that the disease materially contributed to the death, *Halaski v. Hilton Hotel, supra* 487 Pa. at 317, 409 A.2d 367 and *Crucible Steel v. WCAB,* 52 Pa.Comm. 165, 415 A.2d 458 (1980), or was a substantial factor in increasing ("aggravating, reactivating, or accelerating") the risk of harm to the employee which harm may have been more immediately "caused" by some other condition or non-compensable occurrence or ailment. *See* Section 301(c)(1) *and Hamil v. Bashline, supra.*

In Professor Larson's treatise, Workmen's Compensation Law, § 13.11, the author makes the following observations:

The second group of medical-causation cases comprises the cases in which the existence of the primary compensable injury in some way exacerbates the effects of an independent medical weakness or disease. The causal sequence in these cases may be more indirect or complex, but as long as the causal connection is in fact present the compensability of the subsequent condition is beyond question.[4]

. . . . .

"[W]hen the compensable injury produces a condition that interferes with normal curative processes that might have

4. *See, e.g., Drake v. State Department of Social Welfare,* 210 Kan. 197, 499 P.2d 532 (1972) (decedent's compensable back injury prevented him from coughing to clean his lungs—this contributed to his death immediately caused by a non-compensable lung condition and so injury was causally connected to death; compensation award affirmed) *and Petit v. Buckley School,* 284 N.Y.S.2d 117, 28 A.D.2d 1052 (1967) (decedent suffered compensable heart attack—years later, he died from an independent thrombis not immediately related to prior heart attack—medical testimony that prior heart attack was significant element of death because it enhanced decedent's vulnerability and increased risk of harm sufficient to sustain compensation award).

alleviated the preexisting independent condition, the progression of the independent condition is compensable. . . .

It is also worthy of note that federal regulations (20 CFR § 718.205) pertaining to benefits to miners whose death was due to pneumoconiosis [5] provide:

(b) Death will be considered due to pneumoconiosis if any of the following criteria is met:

(1) Where competent medical evidence established that the miner's death was due to pneumoconiosis, or

(2) Where death was due to multiple causes including pneumoconiosis and it is not medically feasible to distinguish which disease caused death or the extent to which pneumoconiosis contributed to the cause of death. . . .

. . . . .

(c) For the purpose of this section, death shall be considered to be due to pneumoconiosis where the cause of death is significantly related to or aggravated by pneumoconiosis.

A related consideration in this case is the issue of the sufficiency of the medical testimony regarding causation. The Commonwealth Court has pronounced a general rule that, where no obvious relationship exists between an injury and work activity said to be its cause, "unequivocal" medical testimony is necessary to establish the causal connection. *See, e.g., Breen v. Pennsylvania Crime Commission,* 52 Pa. Commw. 41, 415 A.2d 148 (1980). This Court has accepted the "general validity" of this rule. *Halaski v. Hilton Hotel, supra* at 487 Pa. 317, 409 A.2d 367. However, an examination of the cases discloses that "unequivocal" does *not* mean that the medical expert must testify to an absolute certainty as to causation or eliminate all other possible causes. As we

5. Pneumoconiosis is the generic term for disease of the lungs caused by the habitual inhalation of irritant mineral or metallic particles. Webster's New Collegiate Dictionary (1977). Silicosis, a particular type of pneumoconiosis, is a condition of massive fibrosis of the lungs marked by shortness of the breath and caused by prolonged inhalation of silica dusts. *Id.*

stated in *Halaski v. Hilton Hotel, supra* at 487 Pa. 317 n. 2, 409 A.2d 367 n. 2:

> The proper test for legal sufficiency of medical testimony is: ... the expert has to testify, not that the condition of claimant might have, or even probably did, come from the [injury], but that in his professional opinion the result in question came from the cause alleged. A less direct expression of opinion falls below the required standard of proof and does not constitute legally competent evidence. *Menarde v. Philadelphia Transportation Co.,* 376 Pa. 497, 501, 103 A.2d 681, 684 (1954).

Further elaboration of the evidentiary standard was made in *Gradel v. Inouye, supra* at 491 Pa. 544, 421 A.2d 679, wherein we stated:

> Expert medical opinion on causation need not be unqualified and absolute, i.e., stated in "categorical terms"; ordinarily, it must establish that the injury was, to a "reasonable degree of medical certainty," caused by the alleged negligence.
>
>> [When] the complexities of the human body place questions as to the cause of pain or injury beyond the knowledge of the average layperson ... the law requires that expert medical testimony be employed. In addition to its bearing on whether or not the defendant's conduct was negligent, such testimony is needed to establish that the injury in question did, with a *reasonable degree of medical certainty,* stem from the negligent act alleged.
>
> *Bashline,* 481 Pa. at 267, 392 A.2d at 1285 (citations omitted, emphasis supplied).

Given the vagaries of the English language and the infinite combination of words which a medical expert may use, it is not surprising to find wide variety in the cases reviewing referees' findings on causation for sufficient competent evidence. As one commentator noted:

> the medical witness must unequivocally assert that the heart attack actually did result from the assigned cause.

A less direct expression of opinion falls below the requisite standard of proof and thus does not constitute legally competent evidence sufficient to support findings of fact. Statements of medical opinion phrased in terms of "could have" or "could be the cause"; "probably was" or "probably a cause and effect relationship"; "highly possible" or "very probable and highly possible"; "might be related"; or "I assume" or "I presume" have been held too equivocal to establish causation. On the other hand, opinions rendered "with a reasonable degree of medical certainty," phrased, for example, as "I think it certainly accelerated his death," "it is my opinion that [the accident] was aggravating," or "it is my opinion [the work] precipitated that which caused his death, namely, the coronary occlusion" were all held sufficiently unequivocal to establish causation. The witness need not establish causation to a medical certainty, nor need he rule out all other possible causes. There must in all cases be an adequate factual basis in the record upon which the witness predicates his opinion.

Heart Attacks and the Pennsylvania Workmen's Compensation Act: Establishing the Causal Relationship between Employment and Injury, 81 Dick.L.Rev. 111, 130–31 (1976) (footnote references omitted).

From the foregoing, it seems apparent that there are different degrees of "equivocation". In the realm of causation, "sufficient competent evidence", 77 P.S. § 834, means that the expert medical testimony must establish no more—and no less—than that, to a reasonable degree of medical certainty, the death or disability was causally connected to the injury (including an occupational disease). No "magic words" are required so long as the words chosen convey the professional opinion as to causation to that reasonable degree of medical certainty. *Wilkes-Barre v. WCAB,* 54 Pa. Commw. 230, 420 A.2d 795 (1980). And of course, the referee's determination whether the medical testimony suffices to demonstrate causation is entitled to substantial

deference as the Act has vested the referee with broad discretion in assessing the credibility of witnesses and making findings of fact. *Halaski v. Hilton Hotel, supra* 487 Pa. at 319, 409 A.2d 367.

The referee in the instant case made a finding of fact that decedent had been continually exposed to a silica dust hazard during his 33 years of employment at J.H. France Refractories, Inc. He further found that Dr. William H. Dreibelbis concluded, in deposition, that pneumoconiosis was a contributing cause of death and that Dr. Robert L. Hall, in his deposition, concluded that silicosis was a major contributing cause.[6]

In the instant case, the majority's characterization of the medical testimony as being "essentially, that silicosis *may* have been among the causes of decedent's death," at 239, is, it seems to me, rather unfair. To support this characterization, the majority isolates excerpts from the depositions of Drs. Dreibelbis and Hall. At 241, n. 5. In viewing this deposition testimony in its entirety, I am compelled to agree with the following synopsis by the Board, as set forth at 3–4 of the Board's opinion dated June 8, 1978:

> [T]he essential issue is whether or not the Referee did have sufficient competent evidence upon which to base his findings. We believe that he did. Certainly the testimony of Dr. Dreibelbis was not in and of itself sufficient to constitute a direct expression of opinion as to the causal

---

**6.** It is misleading for the majority to state that the expert medical testimony failed to establish unequivocally that the occupational disease existed, slip opinion at 6, in light of the uncontradicted testimony of the doctors that decedent had been treated for years for pneumoconiosis/silicosis and the nonmedical testimony regarding decedent's constant workplace exposure to scilica dust. As was noted by the Workmen's Compensation Appeal Board in its opinion of June 8, 1978 "this appeal has been limited to the specific issue of whether or not pneumoconiosis was a contributing cause to the death of the decedent. The Defendant apparently does not question the findings that decedent had been exposed to a silica hazard and that he was suffering from pneumoconiosis. It is only how that disease relates to the decedent's death which is at issue." Slip *opinion of June 8, 1978, at 2.*

connection between the injury and the decedent's death. We believe that when his testimony is read as background to the testimony of Dr. Hall, however, that it is clear there is sufficient competent evidence upon the record to support the findings of the Referee. Among other things, Dr. Hall specifically testified that: "I felt that his lung disease was an important contributing factor to his death when he died in 1974." And further, on cross-examination, Dr. Hall stated:

A. "The possibility of his surviving heart attack when he had it there, was decreased because of that silicosis, in that the prime thing is the amount of oxygen supplied to the heart muscle that gingered, and if they have the chronic obstructive pulmonary disease, the oxygen concentration getting into that heart muscle is decreased much more than just the heart attack. So, it really aggravates the infarction and heart attack markedly."

Q. "There's no way that you can tell, though, whether he would have survived independent of the silicosis condition?"

A. "No, there's no way."

Q. "So, he could have expired had he not had the silicosis."

A. "Yes, he could have."

Q. "And then, there's no way that you can tell, with a reasonable degree of medical certainty, that the silicosis was the cause of death."

A. "No, but it was a markedly contributing factor to the death because of the damage that had been done to the lungs prior to . . ."

Q. "It was a contributing factor in the sense that it decreased his possibility of survival of the myocardial infarction?"

A. "Right. And Probably with an anoxia like that, the extent of the injury to the heart muscle would be larger."

A review of this testimony reveals that the doctor recognized that a definite determination could not be made, especially because of lack of an autopsy, but it is our opinion that he did not compromise or contradict his previously expressed opinion as to the cause of death.

I would hold that the expert medical testimony establishes, to a reasonable degree of medical certainty, that Mr. McCloskey's death resulted from his occupational disease (silicosis) in that silicosis increased the risk of harm from the myocardial infarction, thus aggravating or accelerating an independent, preexisting condition. Sufficient competent evidence exists, therefore, to support the referee's finding that silicosis was a "significant, contributing causative factor in the death" of Mr. McCloskey and to sustain the award of benefits.

Finally, I believe that the expert medical testimony quoted above also meets the majority's standard of causation, namely, that "unequivocal medical evidence" establishes that silicosis existed and was a "substantial, contributing factor" in bringing about death.

Accordingly, I would reverse the Commonwealth Court and remand the case to the Board for computation of benefits under the appropriate schedule of compensation in existence at the time of death.[7] Given the inordinate amount of time that this case has taken to reach final resolution (appellant's perserverance is remarkable and is to be commended), I would direct that the Board render its computation with all due haste.

7. Reinstatement of the referee's award would be inappropriate for two reasons. First, the original award of June 21, 1977 purported to be computed pursuant to the schedules of compensation in the Workmen's Compensation Act. However, the *amount* of compensation ($54.00 per week) seems to be the amount specified in the Occupational Disease Act, 77 P.S. § 1407(4). Second, the subsequent award following remand, rendered on December 26, 1978, inexplicably alters the amount of compensation to $100.00 per week until June 6, 1975 and $95.34 per week thereafter. The record does not disclose a basis for the alteration of weekly benefits. The better course, therefore, is to simply remand to the Board for computation of benefits.