521 A.2d 398

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Benjamin TERRY, Appellant.**

Supreme Court of Pennsylvania.

Argued April 15, 1986.

Decided Feb. 17, 1987.

---

382

384

Leigh P. Narducci, for appellant.

Thomas E. Waters, Jr., Dist. Atty., Ronald T. Williamson, Sp. Asst. Dist. Atty., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

HUTCHINSON, Justice.

For the second time,[1] Benjamin Terry appeals as of right directly from Montgomery County Common Pleas a jury-imposed sentence of death [2] along with convictions of assault by a life prisoner,[3] aggravated assault,[4] and recklessly endangering another person.[5]

Appellant asks us to consider an unforeseen and unfortunate apparent conflict between a recent double jeopardy

---

1. Appellant was tried, convicted and sentenced to death in November, 1979. We vacated the conviction and remanded for a new trial because the jury was permitted to have a copy of appellant's written confession during its deliberation in violation of Pa.R.Crim.P. 1114. *Commonwealth v. Terry*, 501 Pa. 626, 462 A.2d 676 (1983).

2. 42 Pa.C.S. § 9711(h)(1). The case came here after appellant's post-trial motions were denied.

3. 18 Pa.C.S. § 2704.

4. 18 Pa.C.S. § 2702.

5. 18 Pa.C.S. § 2705.

decision of this Court in homicide cases generally, *Commonwealth v. Beck*, 502 Pa. 78, 464 A.2d 316 (1983),[6] and a decision of the United States Supreme Court requiring the presentation of lesser included homicides reasonably implicated by the evidence to juries in capital cases. *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). This conflict poses the key issue in the present case.

Relying on our holding in *Commonwealth v. Beck, supra*, the trial judge granted the Commonwealth's motion *in limine* and refused to instruct the jury that it could find appellant guilty of third degree murder or voluntary manslaughter as well as first degree murder. The trial judge felt this refusal was dictated by the *Commonwealth v. Beck* majority's holding that a superfluous jury verdict of not guilty of lesser included homicides, accompanying a guilty verdict on murder precludes re-trial on the lesser included homicides if the murder conviction is vacated. The *Beck* majority relied on double jeopardy and the statute set out at 18 Pa.C.S. § 109[7]. It also held these rights non-waivable. In this case, the jury at appellant's first trial returned just such a verdict.[8] Thus, under the rationale of

6. Mr. Chief Justice Nix filed a dissenting opinion in which Mr. Justice McDermott joined. Mr. Justice Hutchinson dissented separately, but joined part of the Chief Justice's opinion.

7. The statute provides in relevant part:
 When a prosecution is for a violation of the same provision of the statutes and is based upon the same facts as a former prosecution, it is barred by such former prosecution under the following circumstances:
 (1) The former prosecution resulted in an acquittal. There is an acquittal if the prosecution resulted in a finding of not guilty by the trier of fact or in a determination that there was insufficient evidence to warrant a conviction.
Though this statute implicates the double jeopardy clause, it is not identical to the constitutional guarantee. The *Commonwealth v. Beck* majority seems to base its decision on the federal and state constitutions and the statute. However, further analysis in light of *Beck v. Alabama* has apparently rendered its federal constitutional base illusory. Therefore, our holding in *Commonwealth v. Beck* now seems more properly based on state grounds which, of course, must give way in those cases in which they conflict with the federal Constitution.

8. That jury initially found appellant guilty of first degree murder and voluntary manslaughter but not guilty of third degree murder. The

*Commonwealth v. Beck,* appellant was acquitted of all homicide charges except first degree murder.

Appellant now argues that *Beck v. Alabama, supra,* gives him a constitutional right to instructions on the lesser included homicides in this capital case.

On this particular record we reject appellant's argument. *Beck v. Alabama, supra,* requires an instruction on the lesser included homicides only when the evidence permits a rational jury to determine they were the offenses committed. Here, appellant did not meet his burden of producing evidence which, under the substantive law of Pennsylvania, would require the court to instruct on either (a) the Commonwealth's duty to persuade the jury that appellant's capacity to reason was not so affected by mental illness that he could not premeditate or (b) voluntary manslaughter under 18 Pa.C.S. § 2503(b) arising out of a sincere but unreasonable belief in the necessity of self-defense.

▪▪▪ We recognize that diminished capacity, if established, would negate premeditation and reduce the crime to third degree murder. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982); *Commonwealth v. Weinstein,* 499 Pa. 106, 451 A.2d 1344 (1982); *Commonwealth v. Walzack,* 468 Pa. 210, 360 A.2d 914 (1976). Appellant's experts testified, in the air so to speak, about a delusion of cruel experimentation on appellant's injured legs and speculated about the effect of the prescribed drugs he was taking. They did not precisely relate either of these or the other general psychological and physiological conditions they discussed to appellant's planned and brutal act of beating the victim to death. Their testimony, couched in terms of possibilities, was incompetent under well recognized case law concerning medico-legal causation.[9]

trial judge informed the jurors that their verdict was inconsistent and explained that they could convict on only one homicide count. After further deliberations, the jury found appellant guilty of first degree murder but not guilty of third degree murder and voluntary manslaughter.

9. The only expert evidence which spoke to premeditation and specific intent consisted of bald statements of the non-existence of these

 In addition, our death penalty statute, unlike Alabama's, requires the same jury which declared a defendant guilty of a capital offense to consciously choose the death sentence after considering and weighing all aggravating and mitigating factors. Finally, any error in not giving the requested instructions at the guilt phase was harmless beyond a reasonable doubt. In sentencing, the jury had before it all the evidence of diminished capacity which appellant could have properly offered to reduce the degree of this homicide and was instructed on the propriety of mitigating appellant's punishment if it believed his evidence of diminished capacity. It, nevertheless, chose death over life. We therefore affirm the conviction and the death sentence imposed.[10]

In March, 1979, appellant was serving a life sentence for arson and murder in Graterford State Prison. During an exercise period in the prison's courtyard on March 29, he hid a baseball bat in his trouser leg. As appellant returned to Block C, Captain Felix Mokychic, a prison guard, was checking the prisoners' passes at the entrance. Appellant removed the bat and attacked the guard when his back was turned. He clubbed the victim's head repeatedly; Mokychic died as a result. Appellant was immediately taken into custody. He later admitted to the state police that he hid the bat in his pants and began looking for someone to kill. He chose Captain Mokychic with whom he had a prior conflict. Appellant believed that this would enhance his standing among the prisoners.

## I. *Failure to Instruct Jury on Lesser Included Offenses*

*Beck v. Alabama* dealt with an Alabama statute which defined capital murder as "[r]obbery or attempts thereof

---

ultimate facts. This conclusory expert testimony is improper in Pennsylvania because it is wholly unsupported by the experts' underlying testimony. *Commonwealth v. Daniels,* 480 Pa. 340, 390 A.2d 172 (1978).

10. We have considered all the other issues appellant raises. They lack merit for the reason given below. At 404–410. In addition, we have independently reviewed the record for sufficiency and proportionality to insure against arbitrary imposition of the death penalty. At 409.

when the victim is intentionally killed by the defendant." [11] If convicted, the death penalty was mandatory, and the jury was statutorily precluded from considering lesser included offenses.[12] Only two options were open to the jury, convict the defendant and impose the mandatory death sentence or acquit him entirely. If the defendant was convicted, the trial judge was required to hold a hearing and receive evidence of aggravating and mitigating circumstances. After that hearing, the judge had power to vacate the death penalty and instead sentence the defendant to life imprisonment without parole.

Consistent with its other Eighth Amendment death penalty cases, the United States Supreme Court in *Beck v. Alabama, supra,* held that this all or nothing approach introduced an unacceptable risk that the jury would return an unreliable verdict of guilt. 447 U.S. at 637, 100 S.Ct. at 2389. The Court observed that if the evidence showed the defendant guilty of some lesser offense, but not capital murder, the jury might choose to convict him of the capital offense rather than let him escape scot free. *Id.* at 642-43, 100 S.Ct. at 2392. The United States Supreme Court held that this element of unreliability in the guilt determination of a capital case so increased the risk of unwarranted imposition of the death penalty that the Alabama statute was unconstitutional.[13] *Id.* at 643, 100 S.Ct. at 2392.

On this record, however, we do not find that the death sentence imposed on appellant violates *Beck v. Alabama.* The evidence presented by appellant to show "diminished capacity" was insufficient to meet his burden of production and implicate the issue. This is so because the evidence was either irrelevant under Pennsylvania substantive law or

11. Ala. Code § 13-11-2(a)(2) (1975).

12. Ala. Code § 13-11-2(a) (1975).

13. If *Commonwealth v. Beck* is construed to add a provision to our capital punishment statute like that in the Alabama statute, it could arguably render our statute unconstitutional. We would be loath to persist in our adherence to *Commonwealth v. Beck* in the face of such a possible result. However, we do not reach that issue on this record for the reasons given.

failed to establish legal cause. Thus, no charge on the lesser included offenses was warranted by the evidence. A review of the development of our law relating to the admission of expert psychological and psychiatric testimony on the issue of a defendant's ability to form the requisite *mens rea* is necessary to understand these deficiencies.

■■■ Prior to the decision of this Court in *Walzack, supra,* Pennsylvania had precluded the use of expert psychiatric testimony on the issue of a criminal defendant's *mens rea. E.g., Commonwealth v. Tomlinson,* 446 Pa. 241, 284 A.2d 687 (1971); *Commonwealth v. Ahearn,* 421 Pa. 311, 218 A.2d 561 (1966). *Walzack* held that expert evidence which is relevant to a defendant's *mens rea* is admissible in Pennsylvania. 468 Pa. at 218–20, 360 A.2d 918–19. We held its admission is required if the defendant is not to be deprived of relevant evidence on a constituent element of the crime of murder. *Id.,* 468 Pa. at 223, 360 A.2d at 920–21. As shown subsequently by *Weinstein* and *Zettlemoyer, Walzack* did not make *all* expert psychiatric testimony on the issues of sanity, malice, specific and general intent admissible or relevant. *Zettlemoyer, supra* 500 Pa. at 28, 454 A.2d at 943; *Weinstein, supra* 499 Pa. at 112–13, 451 A.2d at 1347. Such testimony must be definite and specific and address a recognized defense under Pennsylvania substantive law. Nor did these cases change the rule that expert testimony offered to prove a medico-legal fact, such as causation, is incompetent and inadmissible unless it speaks to more than a mere possibility.

■■■ We have held that expert psychiatric testimony is relevant and admissible to show a defendant's inability to premeditate. This so-called "diminished capacity" defense is available in Pennsylvania only on murder charges. *Commonwealth v. Garcia,* 505 Pa. 304, 311, 479 A.2d 473, 477 (1984); *Commonwealth v. Walzack, supra* 468 Pa. at 214, 360 A.2d at 916. It is a limited one. *Commonwealth v. Weinstein, supra; Commonwealth v. Zettlemoyer, supra.* As we stated in *Weinstein:*

[P]sychiatric testimony relevant to the cognitive functions of deliberation and premeditation is competent on the issue of specific intent to kill. Thus psychiatric testimony is competent in Pennsylvania on the issue of specific intent to kill if it speaks to mental disorders affecting the cognitive functions necessary to formulate a specific intent. Where, as here, it does not, it is irrelevant and hence inadmissible.

499 Pa. at 114, 451 A.2d at 1347. Such evidence is irrelevant in Pennsylvania because our substantive law does not recognize the so-called "diminished capacity" defense to first degree murder unless the mental illness involved affects cognitive functions to an extent which precludes deliberation and premeditation.

The evidence in this case does not implicate reduced capacity or an unreasonable but sincere belief that self-defense was necessary.[14]

At trial, appellant presented the testimony of two qualified experts, Dr. Gerald Cooke, a psychologist,[15] and

**14.** Even though the Commonwealth has the unshifting burden to prove beyond a reasonable doubt all the elements of a crime, *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); *Commonwealth v. Williams*, 463 Pa. 370, 344 A.2d 877 (1975), the defendant has the burden of producing relevant evidence implicating a state of mind other than that which is shared by normal, reasonable men and women. *See Commonwealth v. Rose*, 457 Pa. 380, 389, 321 A.2d 880, 884 (1974). Thus, although the risk of non-persuasion remains with the Commonwealth in cases where the defense is defendant's lack of capacity to form the requisite intent, *Commonwealth v. Fairell*, 476 Pa. 128, 134, 381 A.2d 1258, 1260–61 (1977); *Commonwealth v. Rose, supra*, the Commonwealth does not have to produce expert testimony on the issue of capacity, or impeach or rebut the defense evidence. The defendant has the burden of producing relevant evidence indicating a lack of capacity to premeditate or deliberate. The Commonwealth has the burden of persuading the jury that the defendant has the requisite *mens rea* if the evidence implicates inability to premeditate or deliberate. But see the statute which places the burden of persuasion that general insanity exists on the defendant. 18 Pa.C.S. § 315.

**15.** Because we determine that the expert testimony in this case is not relevant or competent under Pennsylvania law to establish the defense of lack of capacity to premeditate and deliberate, we need not and do not express an opinion concerning the psychologist's competence to

Dr. Glenn Glass, a psychiatrist. Based on examination of appellant and review of his records, Dr. Cooke said appellant suffered from a dyssocial personality with paranoid hysterical and explosive features and organic brain syndrome with epileptic seizures. He also found one episode of acute psychotic break in appellant's past: appellant's belief that guards were injecting poison into his ankles and thus crippling him. N.T. Vol. III at 104–05. Dr. Cooke then testified to a reasonable psychological certainty that appellant lacked the capacity to premeditate and deliberate on the day he attacked Capt. Mokychic because of his "mental illness." N.T. Vol. III at 123. He then explained his answer.

> I base that, first of all, ... [on] the description of the personality and organic brain damage that I have already given. In addition, it's my opinion that the *resentment and rage that he felt build up* ... brought him to the point where *he did make a decision* and that decision was that *he would protect himself and not let himself be beaten again.* So that he decided to protect himself, and *if somebody tried to hurt him, he would hurt them.*
>
> However, what I believe happened at that moment, then, within that context, is that *when the captain grabbed him, he went into a rage;* it was *immediate, it was reactive,* it was based on an *emotional response. He didn't stop and deliberate and think and form the intent. He reacted.* And it's on that basis that I reached that opinion.

N.T. Vol. III at 123–24 (emphasis supplied). This testimony fails to meet the *Weinstein* standard for admissibility. Dr. Cooke's explanation directly advances impulsive rage as negating premeditation. We have definitively rejected this concept, not only in *Weinstein, supra* 499 Pa. at 115, 451 A.2d at 1348, but also in *Walzack, supra* 468 Pa. at 214, 360 A.2d at 916. *See also Commonwealth v. McCusker,* 448 Pa. 382, 292 A.2d 286 (1972). Only "mental disorders

testify regarding this defense. *See Zettlemoyer, supra* 500 Pa. at 35 n. 8, 454 A.2d at 947 n. 8.

affecting cognitive functions necessary to form specific intent," *Weinstein, supra* 499 Pa. at 114, 451 A.2d at 1347, are admissible. Dr. Cooke testified that appellant had experienced acute psychotic break in his past; he did not diagnose him as psychotic. He was diagnosed as having a dyssocial personality with psychotic features.

"Personality" is defined in *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* Appendix B, 366 (3d ed. 1980) (DSM III) as "[d]eeply ingrained patterns of behavior, which include the way one relates to, perceives, and thinks about the environment and oneself." It is only when these patterns of behavior are "inflexible and mal-adaptive and cause either significant impairment in *social or occupational functioning* or subjective distress that they constitute personality disorders." *Id.* at 305 (emphasis added). It is not clear from Dr. Cooke's diagnosis whether he was describing appellant's personality or indicating that he suffered from a personality disorder. If he was merely describing appellant's personality, his testimony is not relevant to the defense of diminished capacity, which requires evidence of a mental disorder. The term "mental disorder" is defined in DSM III at 363 as:

> a clinically significant behavioral or psychologic syndrome or pattern that occurs in an individual and that typically is associated with either a painful symptom (distress) or impairment in one or more important areas of functioning (disability).... When the disturbance is limited to a conflict between an individual and society, this ... is not by itself a mental disorder.

■ Even if Dr. Cooke's diagnosis was that appellant suffered from a dyssocial personality disorder,[16] such a mental disorder does not affect the cognitive functions of

16. "Dyssocial personality" disorder appears to be a form of antisocial personality disorder. It is defined as a personality disorder in which "there are a history of continuous and chronic antisocial behavior in which the rights of others are violated ... and failure to sustain good job performance over a period of several years." DSM III at 317–18.

premeditation and deliberation.[17] The witness explained his dyssocial diagnosis:

And what I mean by that is this: that early in life I think he had some needs to be nurtured, to be cared for, and these were pretty well deprived[.] ... He wants to be close to people. He wants people to like him, but he doesn't know how to go about doing this.... So, he's grown up as a very distrustful person who feels others won't respond to his needs, who feels that he must take care of himself because nobody else is going to take care of him.

He has a longstanding anger toward authority figures. He feels that if he wants to do something, then he should be allowed to do it, even if an authority figure says he should not, even if there is a rule or regulation against it. I'm calling him dyssocial, though, not antisocial, because he does have the capacity to relate to others and to be loyal to others, to be caring about others. [They] are, in most cases, people who are serving long sentences within the prison system. He has adopted kind of a it's-us-against-them sort of role.

N.T. Vol. III at 103–04. This evidence does not implicate the defense of diminished capacity. *Zettlemoyer, supra* 500 Pa. at 29–30, 454 A.2d at 944.

■■■■ Dr. Cooke also found that appellant suffered from organic brain syndrome. He defined this as actual physical damage to the brain. N.T. Vol. III at 99. He reached this conclusion from the results of various intellectual and neuro-psychological tests. These tests revealed a dull-normal I.Q., normal motor skills, but poor vocabulary, memory, attention span and concentration. N.T. Vol. III at 97–98. The witness, however, did not testify that appellant's brain is so damaged that he could not premeditate or deliberate. All the relevant fact evidence on this issue shows he could. We recognize that the test results indicate

17. In addition, neither expert testified that appellant's dyssocial personality was caused by trauma or other damage to his brain. *Cf. Walzack, supra* (lobotomy).

that appellant's ability to reason is below normal, but no more than that. Below average mentality is not a defense to homicide generally or first degree murder specifically in this jurisdiction.

■ Finally, Dr. Cooke stated that appellant did not have the capacity to deliberate and premeditate on the day in question. N.T. Vol. III at 123. Experts' opinions on an ultimate issue are admissible in some situations but only if supported by prior testimony. *Commonwealth v. Daniels,* 480 Pa. 340, 352–53, 390 A.2d 172, 178 (1978). Our preceding review shows that this conclusion is not supported by his properly admitted, relevant previous testimony. Thus, this opinion was not properly admitted and lends no support to appellant's claim that third degree murder or manslaughter were implicated in this case by reason of a mental disorder.

The testimony of the psychiatrist, Dr. Glass, also fails the *Weinstein* guidelines. Dr. Glass testified that appellant suffered from mental illness.

> Well, there really are two basic diagnoses.... [H]e suffers from a personality disorder of a mixed type, with both anti-social and paranoid aspects to it. In addition, he also suffers from organic brain disease.

N.T. Vol. III at 155. The witness explained that appellant's personality disorder is really dyssocial rather than anti-social. An anti-social person recognizes no rules at all, but appellant recognizes rules, and right and wrong within his own circle. That is the limited circle of his prison peers. N.T. Vol. III at 156. The honor that exists among thieves serves not to justify the wrong they do to law abiding citizens.

■ Dr. Glass also found organic brain disease, basing this finding in part on appellant's history of hyperactivity and epilepsy, and his intellectual shortcomings including poor short term memory and cognitive rigidity. N.T. Vol. III at 157–59. He stated that organic brain disease is similar to senility. N.T. Vol. III at 158. He named a large number of drugs prescribed and given to appellant while he

was in prison to treat various medical and behavioral problems. N.T. Vol. III at 158–64. He testified that the drugs can interact and cause unintended effects and he considered their effect in his diagnosis. N.T. Vol. III at 159–60. He testified about the effect that combinations of the drugs appellant was given *may* have on *some* people, particularly the elderly and those with brain damage. N.T. Vol. III at 161–64. He did not testify about their effect on this appellant. This general abstract expert testimony is of no help to a jury in deciding the case before them. It does not relate general medical knowledge to the facts at hand. Only expert testimony which assists the jury is admissible, *Commonwealth v. Daniels, supra.*

In addition, Dr. Glass did not untangle the contribution of any of the conditions he diagnosed as factors in appellant's defense to his brutal and unacceptable act of beating Mokychic to death. Thus, none of these factors were shown to be the legal cause of appellant's alleged incapacity to premeditate and deliberate. We have adopted a "substantial factor" standard for legal causation. *Whitner v. Lojeski,* 437 Pa. 448, 263 A.2d 889 (1970) (approving Restatement (Second) of Torts § 431). We have held that substantial cause may be shown by "unequivocal medical evidence that the deceased suffered from an occupational disease and that it was a substantial, contributing factor among the secondary causes in bringing about death." *McCloskey v. Workmen's Compensation Appeal Board,* 501 Pa. 93, 101, 460 A.2d 237, 241 (1983).[18] In Pennsylvania, antisocial or dyssocial personality does not justify beating a guard to death with a bat or reduce the degree of the crime of murder. *See Zettlemoyer, supra.* Where expert testimony indicates that there are multiple causes of an alleged lack of capacity to premeditate and deliberate, and one of these causes is not recognized as a matter of law,

18. Although these cases deal with the burden of producing evidence of causation in civil cases, we see no reason why their logic is inapplicable to medico-legal causation in criminal matters. It would be otherwise if we were dealing with risk of non-persuasion, where the civil and criminal standards differ.

there must be a showing with unequivocal medical/psychiatric testimony that one or more of the remaining causes was a substantial, contributing factor to the incapacity in order to establish this defense. Once dyssocial personality is taken out of consideration, neither we nor a jury can tell whether either the drugs or the organic brain syndrome, alone or together, were substantial, contributing factors to the killing of Mokychic.

Dr. Glass then testified to a reasonable medical certainty that appellant was suffering dyssocial personality with paranoid and explosive traits and organic brain disease, all of which he classified as mental illness. N.T. Vol. III at 165. He did not diagnose appellant as paranoid. He stated that the dyssocial personality made appellant feel constantly vulnerable and that he compensated for this feeling by protective shows of bravado. N.T. Vol. III at 165–66. Dr. Glass concluded:

And I don't believe that he had any intention of doing anything but protecting himself.

Unfortunately, when the correctional officer grabbed or pushed or got physical with Mr. Terry, *he reacted as if he had been a coiled spring* that suddenly unraveled and *unleashed a violent episode.* I *do not believe* that, given this psychiatric make-up, his organic brain disease, the contribution of these medications, that *he was able to control that impulse* at that time, that rage response.

N.T. Vol. III at 167–68 (emphasis supplied). This is the only place in his testimony that Dr. Glass actually mentions the effect of the drugs on appellant. However, he fails to differentiate or relate that effect to his organic brain damage or dyssocial personality. Thus, this testimony does not establish legal cause as defined in this jurisdiction, *McCloskey, supra,* and for this reason, appellant has failed to meet his burden of production on the issue of his mental capacity.

The testimony also hopelessly mixes together two different defenses, diminished capacity and imperfect self-defense manslaughter, 18 Pa.C.S. § 2503(b), without meeting our substantive requirements for either. The witness's

statement that appellant reacted like a "coiled spring" when Capt. Mokychic touched him and was not able to control his rage impulse is not relevant to negate premeditation under our law for the reasons set out above at 404. It is not relevant to show manslaughter because there is no evidence appellant sincerely held the unreasonable belief that deadly defensive force was necessary, 18 Pa.C.S. § 2503(b), and the provocation is insufficient to put a reasonable man into a killing rage.

Dr. Glass went on to testify that appellant suffered from delusions that the guards had crippled him by shooting poison into his ankles, did not recognize the rules of society and stole the bat to protect himself. However, he failed to testify that appellant reasonably or unreasonably believed that he was in danger of death or serious bodily injury when he attacked and beat the guard to death with the bat he had concealed about his person before setting up the confrontation. This testimony also fails to implicate imperfect self-defense, which would reduce the killing to manslaughter. 18 Pa.C.S. § 2503(b). *See also Commonwealth v. McNeil,* 497 Pa. 187, 439 A.2d 664 (1981).

In conclusion, Dr. Glass stated that appellant did not premeditate or deliberate before striking Capt. Mokychic. N.T. Vol. III at 168. Like Dr. Cooke's testimony, this assertion is not supported by his prior testimony and was improperly admitted. In addition, the form of the question is wrong. It invades the province of the jury. *Commonwealth v. Garcia, supra* 505 Pa. at 304, 310 n. 2, 479 A.2d at 476 n. 2.

We have searched the record in vain to find other evidence of the lesser included offenses; appellant presented none. There is nothing to indicate this act flowed from illness rather than evil. No charge on the lesser included offenses was warranted in the guilt phase of appellant's trial.

Nevertheless, the legislative policy of Pennsylvania makes this type of psychiatric testimony relevant and proper for presentation at sentencing to the only body with

power to exercise this state's right to punish with death the evil taking of human life. *See Commonwealth v. Weinstein, supra* 499 Pa. at 115, 451 A.2d at 1348; 42 Pa.C.S. § 9711. This policy constitutes an independent basis for distinguishing *Beck v. Alabama.* In Pennsylvania, unlike Alabama, death does not automatically flow from a first degree murder conviction subject only to a judge's power to set it aside. Evidence of mitigating and aggravating circumstances was presented to the jury before it voted for the death penalty. Based on this evidence, the jury was free to impose or withhold the death penalty. Unlike the Alabama jury in *Beck v. Alabama,* the Pennsylvania jury, not the judge, evaluated the aggravating and mitigating circumstances.[19]

At the sentencing hearing, Dr. Glass referred to his diagnosis during the guilt phase and testified more broadly that appellant suffered from extreme emotional and mental disturbance as a result of which his ability to control his conduct was substantially impaired, N.T. Sentencing Hearing at 72–76. Relying on his prior testimony, Dr. Cooke told the jury that appellant was under the influence of severe mental or emotional disturbance. N.T. Sentencing Hearing at 79–81. This testimony is relevant to mitigating factors two, three and five, 42 Pa.C.S. § 9711(e)(2), (3), (5).[20]

**19.** Subsequent United States Supreme Court opinions have not expanded *Beck v. Alabama* beyond the situation therein. *See Hooper v. Evans,* 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982) (under the same capital punishment statute, instructions on lesser included offenses are not required if no evidence supports such instructions); *Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984) (under a similar capital punishment statute, no instruction on lesser included offenses is required if the statute of limitations on them has expired).

**20.** (e) Mitigating circumstances.—Mitigating circumstances shall include the following:

. . . . .

(2) The defendant was under the influence of extreme mental or emotional disturbance.
(3) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

. . . . .

*See Commonwealth v. Walzack, supra* 468 Pa. at 218–220, 360 A.2d at 918–19. Hearing both this evidence and the expert testimony given in the guilt phase, the jury had an opportunity to mitigate punishment. It did not. It imposed the harshest penalty available: death.

The court's error, if any, in failing to charge the jury on lesser included offenses is harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (1978). Under our harmless error test, an error is harmless if it does not prejudice the defendant, or the effect on the jury is minimal. We are convinced beyond a reasonable doubt that a jury unpersuaded by this evidence [21] in choosing between life and death would not be persuaded to lessen the degree of the crime in the guilt phase if it had been instructed to consider it.[22]

 Alternately, appellant ingeniously argues that *Commonwealth v. Beck* is wrongly decided because our failure to restrict it to non-capital cases conflicts with the overriding authority of *Beck v. Alabama*. He says that since the trial court relied on *Commonwealth v. Beck, supra*, in refusing to instruct the jury on the lesser included offenses, we must vacate the death sentence. Appellant would find the Pennsylvania statute as affected by *Commonwealth v. Beck, supra*, facially invalid. This argument is based on inaccurate analysis. There is no conflict between the two cases on this record. The instructions were properly re-

(5) The defendant acted under extreme duress, although not such duress as to constitute a defense to prosecution under 18 Pa.C.S. § 309 (relating to duress), or acted under the substantial domination of another person.

21. As discussed *infra*, appellant's proffered evidence of general prison conditions would not be admissible under any circumstances. Therefore, it is not considered in this analysis. In addition, appellant did not try to present it at the sentencing hearing.

22. The evidence of appellant's prior criminal misconduct which constituted aggravating circumstances, (d)(9) and (d)(10), 42 Pa.C.S. § 9711(d)(9), and (d)(10), admitted at the sentencing phase was also placed before the jury in the guilt phase by appellant's expert witnesses in testifying as to his mental condition. N.T. Vol. III at 96.

404

fused under Pennsylvania law for the reasons given above. A ruling or decision of a lower court will be affirmed if it can be supported on any basis despite the lower court's assignment of a wrong reason. *See Sherwood v. Elgart,* 383 Pa. 110, 117 A.2d 899 (1955).

 Nevertheless, our determination that *Beck v. Alabama* is inapplicable on this record makes plain the conflict between it and *Commonwealth v. Beck* in capital cases. It also highlights the difficulties created when a new trial is granted in a murder case in which the jury has previously rendered an incorrect verdict on the lesser included degrees of homicide. Therefore, we hold that the rule of *Commonwealth v. Beck* shall hereafter have no application to the retrial of capital cases because of its conflict with the overriding authority of *Beck v. Alabama.* In addition, exercising our supervisory power, we direct our trial judges to adopt and enforce procedures in all homicide cases which will prevent the recording of a jury verdict of not guilty on lesser included degrees of homicide when the jury returns a guilty verdict on a higher degree.

## II. *Other Issues*

Appellant raises a number of other issues. We will address them seriatim.

 (a) Appellant asserts that his motion for mistrial during the testimony of Russell Williams should have been granted. On direct examination, Williams, a fellow inmate, testified that appellant had trouble walking and that appellant claimed that he was crippled by guards injecting drugs into his legs and beating him. On cross-examination, the Commonwealth tried to establish that appellant's legs were frostbitten during an escape from Glen Mills Juvenile Detention Center many years earlier and this was the cause of his physical problems. The following exchange occurred:

Q. Are you aware that Mr. Terry had a problem with frostbite as a result of escaping from the juvenile detention center at Glen Mills?

A. No.

Q. You weren't aware of that?

A. No.

Q. But you knew him as a juvenile?

A. (Witness nods head)

Q. Did you know him when he was a juvenile delinquent?

A. I don't understand juvenile delinquent.

MR. NARDUCCI: Objection, Your Honor, and I move for a mistrial.

THE COURT: Objection sustained. The motion is denied.

N.T. Vol. III at 25. Though we cannot condone this interrogation, the reference to appellant's juvenile record is harmless error. *Commonwealth v. Story, supra.* Improper admission of evidence which is cumulative of properly admitted evidence and is uncontradicted is not reversible error. *Id.* 476 Pa. at 411, 383 A.2d at 166–67. This evidence was not only uncontradicted, but introduced by the defense itself in its presentation of the diminished capacity issue. On direct examination the defense's expert witness Dr. Glass referred to appellant's juvenile record and his numerous periods of confinement in Glen Mills and other detention centers. N.T. Vol. III at 95.

■ (b) Prejudicial failure to sever the charge of assault by a life prisoner. In refusing this request, Common Pleas did not abuse its discretion and appellant suffered no prejudice. All jurors were asked on *voir dire* whether this would prejudice them; all those who indicated it would were stricken for cause.

■ (c) Common Pleas' refusal to provide a statistical expert to engender an attack on the racial composition of jury panels drawn from voter registration lists. Appellant hoped to show that blacks are under-represented in voter lists, and therefore he was deprived of his right to be tried by a jury of his peers. There is no merit to this argument. *See Commonwealth v. Edwards,* 493 Pa. 281, 426 A.2d 550 (1981) (voter lists acceptable unless prepared in a discrimi-

natory manner). Appellant attacks the array, not the prosecutor's use of peremptory challenges to the *venire* at *voir dire*. Therefore no *Batson v. Kentucky,* —— U.S. ——, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), issue is involved.

■ (d) Common Pleas improperly limited appellant's *voir dire* examination. The proposed questions dealt with specifics of racial bias, covered generally by the court, as required by *Turner v. Murray,* —— U.S. ——, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986) (*voir dire* on racial bias required in interracial capital murder case). He also sought to explore feelings about persons and prisoners and jurors' personal habits. Common Pleas did not abuse its discretion in refusing these questions. *Commonwealth v. Segers,* 460 Pa. 149, 331 A.2d 462 (1975).

■ (e) Removal, by peremptory challenge, of an unsworn but seated juror when he stated that he could not impose the death penalty if the evidence warranted it. There is no merit to this argument. The juror was subject to removal for cause. *Lockhart v. McCree,* —— U.S. ——, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986); *Commonwealth v. Colson,* 507 Pa. 440, 490 A.2d 811 (1985), *cert. denied* —— U.S. ——, 106 S.Ct. 2245, 90 L.Ed.2d 692 (1986). Jeopardy does not attach until the jury is sworn. *Commonwealth v. Bronson,* 482 Pa. 207, 393 A.2d 453 (1978).

■ (f) The trial judge improperly allowed the Commonwealth to strike for cause all potential jurors who were conscientiously opposed to the death penalty. He claims that such "death qualified" jurors are conviction prone. Both the United States Supreme Court and our Court have rejected this argument, *Lockhart v. McCree, supra; Commonwealth v. Colson, supra.*

(g) Failure to suppress his confession taken seven and one-half hours after the assault and before appellant was arraigned but less than six hours after interrogation by state police began. This rule does not invalidate the confession given here. Appellant was not arrested until the state police arrived. *See* former 37 Pa. Code § 95.1–95.7 (re-

pealed February 18, 1984) (especially § 95.6 forbidding interrogation by prison authorities). In any event, the exigencies of prison administration take this case out of the rule of *Commonwealth v. Davenport,* 471 Pa. 278, 370 A.2d 301 (1977) (accused must be arraigned within six hours of arrest on pain of exclusion of evidence obtained during custody).

■ (h) Improper and prejudicial reference to prior unrelated criminal conduct in the cross-examination of one of appellant's witnesses, called to describe appellant's bizarre behavior to support his claimed mental illness. To rebut the desired inference that appellant could not plan or premeditate, the Commonwealth asked the witness about appellant's use of steel inserts he took from a pair of shoes to fashion a weapon. This evidence was directly germane to the issue of diminished capacity and therefore not improper. *Commonwealth v. Zettlemoyer, supra; Commonwealth v. Peterson,* 453 Pa. 187, 307 A.2d 264 (1973).

■ (i) Error in reading to the jury the testimony of a witness at the first trial who first refused to testify at the second and then claimed a lack of memory. This procedure was proper. The witness was unavailable under *Commonwealth v. Graves,* 484 Pa. 29, 398 A.2d 644 (1979), and the criteria for its use set out at 42 Pa.C.S. § 5917 were met.

■ (j) Improper exclusion of evidence of general prison conditions said to be relevant as the partial cause of appellant's asserted mental illness. The prison system was not on trial. Specific evidence about his behavior and treatment in prison was allowed. The exclusion was a proper exercise of the trial judge's discretion to control the trial and prevent its diversion into collateral matters.

■ (k) Improper presentation of aggravating circumstance (9), 42 Pa.C.S. § 9711(d)(9), "significant history of felony convictions" because all his previous felony convictions arose from one incident. The statute is clear on this point. It uses the term "conviction," not "incidents" or "transactions." *See Commonwealth v. Holcomb,* 508 Pa.

425, 460–63, 498 A.2d 833, 851–852 (1985) (Opinion Announcing the Judgment of the Court), *cert. denied* —— U.S. ——, 106 S.Ct. 1804, 90 L.Ed.2d 349 (1986); *Commonwealth v. Goins*, 508 Pa. 270, 283–84, 495 A.2d 527, 534 (1985). Appellant had a history of four felony convictions. All of them, one count of arson and three murders resulting therefrom, involved violence to the person. The requirements of § 9711(d)(9) were met.

(*l*) Appellant challenges 42 Pa.C.S. § 9711, our death penalty statute's constitutionality, because it contains no criteria for weighing aggravating and mitigating circumstances. We considered and rejected this argument in *Commonwealth v. Zettlemoyer, supra* 500 Pa. at 66–67, 454 A.2d at 963–64.

■■■ (m) Appellant claims that his sentence should be vacated because there is no statutory authority for carrying out the death sentence. In 1913, the legislature passed a death penalty statute. Act of June 19, 1913, P.L. 528. *Inter alia,* that statute established electrocution as the only means of execution, *id.* at § 1, and stated that the entire act would be null and void if any portion is declared unconstitutional, *id.* at § 12. Subsequently, the mandatory sentencing portion was declared unconstitutional, and the legislature enacted a constitutional sentencing statute. 42 Pa.C.S. § 9711. It contains no provision dealing with the manner of execution. Therefore, appellant argues that the death sentence cannot be imposed. The validity of the sentence is not tied to the method of imposition. Only the sentence of death is before us. Since no death warrant has been issued, the question of the method of execution is not properly before us. We will consider this issue if and when it is properly before us.

## III. *Mandatory Review*

In death penalty cases, we are required to independently review the sufficiency of the evidence, *Commonwealth v. Zettlemoyer, supra* 500 Pa. at 26–27 n. 3, 454 A.2d at 942 n.

3, and to review the sentence to determine whether it is "excessive or disproportionate to the penalty imposed in similar cases." 42 Pa.C.S. § 9711(h)(3)(iii). To assist us in the latter task, we have directed the Administrative Office of Pennsylvania Courts (AOPC) to accumulate statistical records on every first degree murder case in the Commonwealth. After reviewing these records, we have concluded that the sentence imposed in this case is neither excessive nor disproportionate.

When reviewing the sufficiency of the evidence, we must view the evidence in the light most favorable to the Commonwealth as the verdict winner together with all reasonable inferences arising therefrom. *Commonwealth v. Lovette*, 498 Pa. 665, 450 A.2d 975 (1982), *cert. denied*, 459 U.S. 1178, 103 S.Ct. 830, 74 L.Ed.2d 1025 (1983). First degree murder is an intentional killing, 18 Pa.C.S. § 2502(a), and the Commonwealth must prove a specific intent to kill. An intentional killing is "killing by means of poison, or by lying in wait or by any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(d).

 Jonathan Herder, a former inmate, N.T. Vol. I at 47–50, and prison guards Arthur Smith, N.T. Vol. I at 89–90, and John Wills, N.T. Vol. I at 181–82, testified that they saw appellant strike Captain Mokychic in the head with a baseball bat. Dr. Halbert Fillinger, a forensic pathologist, conducted a postmortem examination of the victim. He testified that death was caused by repeated hard blows to the skull with a blunt instrument. N.T. Vol. I at 127–28. A jury may properly infer an intent to kill from the use of a deadly weapon on a vital part of the body, *Commonwealth v. Pronkoskie*, 498 Pa. 245, 445 A.2d 1203 (1982), and it could be so inferred here. In addition, appellant admitted committing the crime to State Trooper Joseph Moran. He told Trooper Moran that he took a baseball bat and started looking for someone to kill. He was stopped by Captain Mokychic who gave him a slight shove, at the main entrance

to Cell Block C. Appellant said that he then remembered a prior altercation with the victim and while Mokychic was distracted struck his head with the bat. Mokychic immediately fell to the floor. Appellant noticed that he was still breathing and clubbed him on the head over and over. N.T. Vol. I at 257–58. The jury was not required to believe any of appellant's expert or lay evidence on diminished capacity or mental illness as mitigating circumstances. The evidence is sufficient to support the jury's verdict.

For the foregoing reasons, appellant's conviction and sentence of death are affirmed.[23]

NIX, C.J., files a concurring opinion.

ZAPPALA, J., concurs in the result.

NIX, Chief Justice, concurring.

Regrettably the societal consensus at this time dictates the result reached today. Where one confined in a correctional institution continues to be incorrigible and presents a danger to that population, we have justified the extermination of this tortured soul. It is unfortunate that as a society we are not willing to commit more resources into the area of mental illness which would provide us with a more sophisticated insight into these problems and guide us in the handling of them.

The rules presented in the majority opinion as guiding our judgments in cases arising from mental irregularities are acceptable only because of the inadequacy of the guidance provided by this particular field of medicine. For that reason I must concur in the result. One of the tragedies is that we continue to expose those people who serve in our penal system, such as Captain Mokychic, to an unreasonable risk of danger.

---

**23.** The Prothonotary of the Eastern District is directed to transmit the full and complete record of the proceedings below and our review to the Governor as soon as possible. 42 Pa.C.S. § 9711(i).