711 A.2d 430

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Betty LEGG, Appellant.**

Supreme Court of Pennsylvania.

Submitted Dec. 13, 1996.

Decided April 3, 1998.

438

Caroline M. Roberto, Pittsburgh, for Betty Legg.

Scott A. Bradley and Robert A. Willig, Assistant District Attorney, Pittsburgh, for Com.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

*OPINION OF THE COURT*

NEWMAN, Justice.

Appellant Betty Legg appeals from a Superior Court Order, reversing an Order of the Court of Common Pleas of Allegheny County (PCRA Court), in which the PCRA Court granted Appellant's petition for collateral relief pursuant to the Post–Conviction Relief Act (PCRA), 42 Pa.C.S. § 9541 *et seq.* The issue before us is whether Appellant's trial counsel was ineffective for failing to investigate and present the diminished capacity defense at Appellant's murder trial. We conclude that trial counsel was ineffective where available expert testimony indicated that Appellant was suffering from major depression and anxiety that would have prevented her from rationally forming the specific intent to kill. Therefore, we reverse the Order of the Superior Court and reinstate the PCRA Court's Order, granting Appellant a new trial.

## FACTUAL AND PROCEDURAL HISTORY

The record establishes that Appellant and the victim, Ernest Legg (Mr. Legg), were married in 1956. In 1960, Appellant learned that her husband was having an affair with another woman, Amy Stephenson. Nonetheless, the Leggs reconciled and stayed together until 1980 when Mr. Legg suddenly left. The Leggs obtained a divorce in 1985. They, however, continued to have sexual relations. In early 1986, Appellant learned that Mr. Legg had rekindled his relationship with Stephenson in 1985.

Appellant repeatedly called Stephenson demanding that she leave Mr. Legg alone. Sometimes she would call and then hang up the telephone. She also followed Mr. Legg and

Stephenson by car. Due to her mounting anger toward Stephenson and her fear that she might harm Mr. Legg, Appellant voluntarily sought psychiatric assistance on June 11, 1986. She went to the Northern Communities Mental Health/Mental Retardation Center (Northern Communities MHMR), which recommended immediate in-patient hospitalization. That same day, Appellant was admitted to St. John's Hospital psychiatric ward because she was actively suicidal and was talking about killing her husband. St. John's diagnosed her with recurrent major depression and treated her with tranquilizers. After two days, Appellant left St. John's, against medical advice and discontinued her medications. Appellant then saw a clinical psychologist, Lois Dabney–Smith, Ph.D., several days later for one session but did not return for further treatment.

On her birthday, July 27, 1986, Mr. Legg took Appellant out for dinner. They later engaged in sexual relations, which led Appellant to believe that they were going to be able to resolve their differences. Then, on August 6, 1986, due to Appellant's repeated telephone calls, Stephenson filed charges of harassment against Appellant. The criminal complaint stunned Appellant. Shortly before 4:00 p.m., on August 8, 1986, she drove across town to meet Mr. Legg at his place of employment. She had a gun that she always kept under the front seat of her car for protection.[1] As Mr. Legg exited his place of employment, she approached him, carrying the gun in a bag. Mr. Legg allowed her to join him in the front seat of his car. Appellant begged him to tell her the truth about Stephenson, but Mr. Legg denied any romantic involvement with her. The couple began arguing. She pulled the gun from the bag.

According to Appellant, she had only intended to scare Mr. Legg into telling her the truth. She claims that when Mr. Legg saw the weapon, he grabbed her wrist and the gun went

---

1. According to Appellant, she received the gun from her grandmother's estate several years earlier. Appellant had no formal weapons training and had never test fired the gun, but knew it was loaded. She did not have a license to carry it.

off; as she tried to remove her finger from the trigger, it fired a second time. Mr. Legg exited the car and collapsed. He died of gun shot wounds in the arm and back. After the shooting, Appellant claims that she was in "shock." She drove to the Public Safety Building, where she worked as a dispatcher, to report the incident. She informed the desk sergeant, "I shot my husband" and handed him the gun.

She was then arrested and charged with criminal homicide, 18 Pa.C.S. § 2501, and a violation of the Uniform Firearms Act, 18 Pa.C.S. § 6101. On March 24, 1987, Appellant waived her right to a jury trial and proceeded to a bench trial before the Honorable Alan S. Penkower in the Court of Common Pleas of Allegheny County (trial court). An attorney of the Office of the Allegheny County Public Defender represented Appellant. At trial, defense counsel primarily relied on the defense of accident or homicide by misadventure.[2] Alternatively, counsel asserted a heat of passion defense.[3] Trial counsel did not raise a diminished capacity defense.[4] The trial

2. Homicide by misadventure, which is excusable, is defined as:
   the accidental killing of another, where the slayer is doing a lawful act, unaccompanied by any criminally careless or reckless conduct. "Three elements enter into the defense of excusable homicide by misadventure: [1] The act resulting in death must be a lawful one; [2] It must be done with reasonable care and due regard for the lives and persons of others; and [3] the killing must be accidental and not intentional, or without unlawful intent, or without evil design or intention on the part of the slayer.... Even though the homicide is unintentional, it is not excusable where it is the result or incident of an unlawful act, such as pointing or presenting a gun, pistol or other firearm at another person in such a manner as to constitute an offense under the laws of the state...."
   *Commonwealth v. Hobson*, 484 Pa. 250, 258–59, 398 A.2d 1364, 1368 (1979) (citations omitted).

3. The heat of passion defense, a partial defense to murder, is defined as:
   a homicide intentionally committed under the influence of passion.... The term "passion" as here used includes both anger and terror provided they reach a degree of intensity sufficient to obscure temporarily the reason of the person affected.
   *Commonwealth v. McCusker*, 448 Pa. 382, 388 n. 4, 292 A.2d 286, 289 n. 4 (1972). A killing committed in the heat of passion constitutes voluntary manslaughter. 18 Pa.C.S. § 2503; *McCusker*.

4. As discussed below, a diminished capacity defense alleges an inability to form the specific intent to kill. *Commonwealth v. Travaglia*, 541 Pa.

court convicted Appellant of first degree murder and sentenced her to life imprisonment. The Superior Court affirmed the judgment of sentence and we denied her Petition for Allowance of Appeal.

On February 27, 1991, Appellant filed a PCRA petition requesting a new trial, asserting, *inter alia*, that trial counsel was ineffective for failing to raise the diminished capacity defense. Judge Penkower also presided at the PCRA hearing. At the hearing, Appellant, her trial counsel, and psychologist Dr. Herbert I. Levit, testified concerning her diminished capacity, after which the PCRA Court granted her a new trial. The Superior Court reversed the PCRA Court, holding that trial counsel reasonably relied on the defense of accident or homicide by misadventure, which could have produced an acquittal, and avoided the defense of diminished capacity, that would have admitted guilt and resulted in a sentence for criminal homicide. We granted allocatur on the issue of whether the Superior Court erred in reversing the PCRA Court's determination that trial counsel was ineffective for failing to pursue a diminished capacity defense.

## DISCUSSION

■ To establish an ineffective assistance of counsel claim pursuant to the PCRA, 42 Pa.C.S. § 9543, an appellant must prove that (1) the underlying claim is of arguable merit; (2) counsel's action or inaction was not grounded on any reasonable basis designed to effectuate his client's interest; and (3) counsel's omission or commission so undermined the trial that the verdict is unreliable. *Commonwealth v. Szuchon*, 534 Pa. 483, 633 A.2d 1098 (1993).[5]

■ Here, Appellant argues that, as found by the PCRA Court, the diminished capacity defense would have been a critical issue at trial and defense counsel's failure to explore, investigate, and present available psychiatric evidence consti-

108, 124, 661 A.2d 352, 359 (1995), *cert. denied, Travaglia v. Pennsylvania*, 516 U.S. 1121, 116 S.Ct. 931, 133 L.Ed.2d 858 (1996).

5. Appellant's PCRA hearing pre-dated the 1995 amendments to Section 9543 of the PCRA.

tuted ineffective assistance of counsel. Initially, we note that "[i]n asserting a diminished capacity defense, a defendant is attempting to prove that he was incapable of forming the specific intent to kill; if the defendant is successful, first degree murder is mitigated to third degree." *Commonwealth v. Travaglia,* 541 Pa. 108, 124, 661 A.2d 352, 359 (1995), *cert. denied,* 516 U.S. 1121, 116 S.Ct. 931, 133 L.Ed.2d 858 (1996). Thus, the defendant admits general criminal culpability, but seeks to reduce the degree of guilt to third degree murder. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327, *rehearing denied,* 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). Diminished capacity, however, is an extremely limited defense. *Travaglia.* Psychiatric testimony that addresses "mental disorders affecting the cognitive functions [of deliberation and premeditation] necessary to formulate a specific intent" is admissible. *Zettlemoyer,* 500 Pa. at 28, 454 A.2d at 943. However, psychiatric evidence that a defendant lacked the ability to control his actions or that he acted impulsively is irrelevant and inadmissible on the issue of the defendant's specific intent to kill. *Id.*

At the PCRA hearing, Appellant's expert, Dr. Levit, testified that she was actively homicidal and suicidal at the time of her hospitalization two months before the shooting. He stated that she sought help because she was reaching a point where she could no longer control her behavior. R. 340a. According to Dr. Levit, Appellant suffered from major depression with anxiety at the time of the shooting. Such a disorder, he explained, would have distorted her perception of the situation with her ex-husband and impaired her judgment. R. 334a–35a. Dr. Levit opined that the shooting resulted from her depression and anxiety associated with her feelings of anger and betrayal. R. 344a. He clarified that due to her depression, anxiety, and the intensity of her anger and feelings of betrayal, she lacked the ability to rationally formulate the intent to kill Mr. Legg. R. 349a, 367a–68a. Dr. Levit's testimony spoke to more than an inability of Appellant to control herself, and directly related Appellant's underlying

mental defect to her inability to formulate a specific intent to kill. Based on this testimony, the PCRA Court held that Appellant's claim has arguable merit. The Commonwealth concedes that she satisfied the first prong of an ineffectiveness claim.

The second prong of Appellant's ineffectiveness claim, whether trial counsel had a reasonable basis for not presenting a diminished capacity defense, depends on whether trial counsel knew or, through reasonable investigation, should have known of Appellant's psychiatric history. *See Commonwealth v. Walker*, 540 Pa. 80, 656 A.2d 90 (1995), *cert. denied*, 516 U.S. 854, 116 S.Ct. 156, 133 L.Ed.2d 100 (1995)(counsel not ineffective for failing to call witnesses he had no way of knowing were available); *Commonwealth v. Peterkin*, 511 Pa. 299, 513 A.2d 373 (1986), *cert. denied*, 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987)(counsel has duty to make reasonable investigations). Trial counsel testified that, although he knew that Appellant was experiencing anxiety and depression because of the impending trial, he did not know that she had been diagnosed with major depression and hospitalized before she shot Mr. Legg. R. 387a–89a. However, the record shows that the Public Defender Investigator, who interviewed Appellant after her arrest, noted in his report that Appellant had been to St. John's Hospital and had seen "Dr. Dabney." Trial counsel, a Public Defender, inexplicably testified that he never reviewed the investigator's report. R. 420a. Trial counsel also could not recall whether he interviewed the psychologists or counselors from the Allegheny County Behavior Clinic and Northern Communities MHMR who examined Appellant post-arrest to determine her competency to stand trial. R. 407a. Counsel acknowledged at the PCRA hearing, however, that the Behavior Clinic's report referenced a previous mental disorder and hospitalization. R. 388a. Counsel, thus, had available to him sufficient indicia of Appellant's pre-arrest mental disorder to warrant further investigation. A reasonable investigation would have revealed Appellant's diagnosis and treatment history.

With respect to counsel's strategy, the Superior Court held that counsel had rationally chosen to pursue the defense of an accident, which could have resulted in an acquittal or a finding of guilt less than first degree murder, and to avoid the defense of diminished capacity.[6] Because counsel did not investigate or could not recall investigating Appellant's mental history, we cannot agree with the Superior Court that he made a rational decision to avoid a diminished capacity defense. In fact, counsel's testimony indicates otherwise. When questioned whether he would have proceeded differently if he had known that Appellant suffered from major depression and had homicidal and suicidal ideations, he replied, "Absolutely. First [sic] comes to mind is the defense of diminished capacity, if that can be developed." R. 389a–90a.

6. Underlying Appellant's ineffectiveness claim is her contention that trial counsel had abandoned the accident defense during trial; therefore, he was ineffective in failing to present a diminished capacity defense. The Superior Court referred to the following excerpt of defense counsel's closing argument in holding that counsel had not abandoned the accident defense:

I would argue, Your Honor, certainly the first shot is an accidental shooting when he reaches for the gun. I can't argue, Your Honor, accidental shooting or homicide by misadventure, because I understand the law is when you are involved in an unlawful act, i.e. possession of a firearm in close proximity of someone, with the purse, et cetera, and she has testified it was her intention to pull it out to scare him, that that unlawful act would bar Your Honor from rendering a verdict of not guilty of criminal homicide by virtue of that defense.

That does not preclude Your Honor from finding that verdict out of your mercy dispensing powers, so I'm not arguing that on the basis of the facts alone. At most, you have what I suggest is an unintentional killing based upon exactly the facts you heard here, and that woman's testimony, Judge.

R. 303a. The focus on whether trial counsel abandoned or actively pursued the accident defense is misplaced. Although counsel stated his belief that Appellant's unlawful possession of a firearm would preclude the court from rendering a verdict of not guilty by virtue of an accident or homicide by misadventure, R. 303a, he nonetheless called upon the court to exercise its mercy dispensing powers to find Appellant not guilty or guilty of involuntary manslaughter by virtue of an accidental shooting or homicide by misadventure, R. 303a–305a. Alternatively, counsel suggested that, at most, Appellant may have committed voluntary manslaughter as a result of the heat of passion. R. 304a. As discussed below, nothing precluded trial counsel from presenting the alternative argument of diminished capacity.

Further, the Superior Court determined that counsel had reasonably relied on the defense of accident instead of diminished capacity, which would have admitted guilt and required a sentence for criminal homicide. We disagree with the Superior Court's assessment of counsel's strategy. Although counsel may have hoped for an acquittal, proof of an accidental killing coupled with evidence of malice, implied from Appellant's use of the gun, may have produced a verdict of third degree murder. *See Commonwealth v. Hobson,* 484 Pa. 250, 398 A.2d 1364 (1979). Therefore, the evidence presented actually offered the trial court five possible verdicts concerning the homicide charge: first degree murder; third degree murder; voluntary manslaughter; involuntary manslaughter; and acquittal. Particularly when the facts supported a finding of *first* degree murder, we find no reasonable justification for counsel's failure to also advance a diminished capacity defense that may have produced a verdict of third degree murder. Therefore, we conclude that the record supports the trial court's finding that counsel had no reasonable basis for failing to investigate and present a diminished capacity defense.

The cases relied upon by the Commonwealth, *Commonwealth v. Cross,* 535 Pa. 38, 634 A.2d 173 (1993), *cert. denied,* 513 U.S. 833, 115 S.Ct. 109, 130 L.Ed.2d 56 (1994), and *Commonwealth v. Mizell,* 493 Pa. 161, 425 A.2d 424 (1981), are distinguishable. In each of those cases, this Court held that trial counsel was not ineffective for failing to advance a diminished capacity and/or insanity defense in the defendant's murder trial. We reasoned that an insanity or diminished capacity defense, which would have admitted the commission of the act, would have directly conflicted with each defendant's claim of innocence. Each defendant in *Cross* and *Mizell* maintained that he had not committed the homicide(s) in question. In contrast, and contrary to the Commonwealth's assertion, Appellant does not deny shooting her husband. Thus, the sole question and dispositive issue at trial, here, was Appellant's mental state at the time of the shooting. The Commonwealth sought to prove, *inter alia,* that Appellant committed an intentional killing with malice. Appellant as-

serted that she did not intend to kill her husband—that the shooting was an accident—or, alternatively, that she shot her husband, but acted in the heat of passion. A diminished capacity defense, which suggests general culpability for the shooting but negates the specific intent to kill, would not have directly conflicted with Appellant's position.

■ Consequently, we turn to the last prong of Appellant's ineffectiveness claim, whether she was prejudiced as a result of trial counsel's omissions. The PCRA court held:

Trial counsel's failure to present expert testimony at trial concerning defendant's ability to formulate the specific intent to kill such as would tend to reduce the degree of homicide from first degree to third degree murder, deprived the trier of fact of mitigating evidence regarding defendant's state of mind at the time of the shooting. The Court concludes that trial counsel's ineffectiveness so undermined the truth-determining process that no reliable adjudication of guilt or innocence of the crime of first degree murder could have taken place under the circumstances.

PCRA Court Findings and Order of Court of March 31, 1994. Although the Superior Court did not decide the prejudice issue, in analyzing the merits of Appellant's claim, the court appears to have reweighed Dr. Levit's testimony and concluded that it was speculative. The PCRA court, however, was in the better position to evaluate the doctor's testimony, and the effect of the omission of that evidence on the deliberative process. *Commonwealth v. Lutz,* 492 Pa. 500, 424 A.2d 1302 (1981)(appellate court is not to engage in *de novo* evaluation of testimony; that is task for PCRA court). Although evidence of a specific intent to kill may disprove a defense of diminished capacity, *Commonwealth v. Tempest,* 496 Pa. 436, 437 A.2d 952 (1981) (superseded by statute on other grounds), that evidence here was not so overwhelming that we can conclude that counsel's failure to raise a diminished capacity defense resulted in no prejudice to Appellant. Instead, because defense counsel deprived the trial court of its right to weigh the evidence and assess the credibility of the testimony relating to Appellant's diminished capacity defense, we defer to the

PCRA court's conclusion that no reliable adjudication of guilt or innocence could have taken place.

Accordingly, we reverse the Order of the Superior Court and reinstate the PCRA Court's decision granting Appellant a new trial.

CASTILLE, J., files a dissenting opinion in which NIGRO and SAYLOR, JJ., join.

CASTILLE, Justice, dissenting.

The majority of this Court grants appellant a new trial by holding that appellant's trial counsel was ineffective for failing to investigate and present a diminished capacity defense. I dissent from this holding for two reasons. First, a diminished capacity defense would have conflicted with the defenses that trial counsel reasonably chose to pursue; therefore, trial counsel would have acted unreasonably by arguing diminished capacity. Second, even if trial counsel could reasonably have advocated a diminished capacity defense from a tactical standpoint, appellant still cannot establish by a reasonable likelihood that such a defense would have been available from a legal standpoint. Thus, appellant fails to prove that she was prejudiced by trial counsel's putative ineffectiveness.

As the majority correctly notes, appellant must establish each of the following in order to prevail on an ineffective assistance of counsel claim under the Post Conviction Relief Act ("PCRA"):[1] (1) that the underlying claim is of arguable merit; (2) that counsel's action or inaction was not grounded in any reasonable basis designed to effectuate his client's interest; and (3) that counsel's omission or commission so undermined the trial that the verdict is unreliable. *Commonwealth v. Szuchon*, 534 Pa. 483, 633 A.2d 1098 (1993). Because the bulk of the majority's discussion focuses on counsel's reasonableness, I will first discuss my disagreement with the majority regarding that issue.

1. *See* 42 Pa.C.S. § 9543 (appellant's PCRA hearing predated the 1995 amendments to section 9543 of the PCRA).

Trial counsel is generally not precluded from advancing alternative defenses on behalf of a criminal defendant, even when those defenses are inconsistent. *See Commonwealth v. Hilliard,* 471 Pa. 318, 338, 370 A.2d 322, 332 (1977) (citations omitted); *Commonwealth v. Jorgenson,* 512 Pa. 601, 606 n. 3, 517 A.2d 1287, 1290 n. 3 (1986); *but see Commonwealth v. Harris,* 542 Pa. 134, 140, 665 A.2d 1172, 1175 (1995)(defense of self-defense not permitted because it was mutually exclusive of the defense of accident or mistake). Nevertheless, it is axiomatic that trial counsel may reasonably make a strategic decision to *decline* to put forth inconsistent defenses, especially when one defense would undermine the other. *See Commonwealth v. Stoyko,* 504 Pa. 455, 471, 475 A.2d 714, 723 (1984); *Commonwealth v. Holloway,* 524 Pa. 342, 352, 572 A.2d 687, 692 (1990); *Commonwealth v. Pfaff,* 233 Pa.Super. 153, 163, 335 A.2d 751, 756 (1975).

Here, trial counsel's primary argument was that the shooting had been accidental and that the trial judge should render a verdict of involuntary manslaughter[2] or even exercise his "mercy dispensing powers" to render an outright acquittal. *See* Trial Trans. at 214–218 (Record at 301a–305a). Asserting the defense of diminished capacity would have been inconsistent with and would, in fact, have undermined this strategy.

By asserting the defense of diminished capacity, a defendant concedes general criminal liability and seeks to reduce the degree of guilt from first to third degree murder. *See Commonwealth v. Travaglia,* 541 Pa. 108, 124 n. 10, 661 A.2d 352, 359 n. 10 (1995); *Commonwealth v. Walzack,* 468 Pa. 210, 221, 360 A.2d 914, 920 (1976). Thus, if appellant had attempted to prove her diminished capacity at the time of the shooting, she would necessarily have conceded her guilt as to third degree murder, a felony of the first degree carrying a prison term of up to forty years.[3] However, appellant's primary

**2.** A person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person. *See* 18 Pa.C.S. § 2504.

**3.** *See* 18 Pa.C.S. §§ 1102, 2502.

argument at trial was that she was entitled to an even lesser verdict of involuntary manslaughter, a misdemeanor of the first degree, and possibly even an acquittal under the circumstances of this case. This strategy was precipitated by appellant's own version of the shooting, to which she testified in relevant part as follows:

Q: Why did you [take the gun out]?

A: Because I wanted to frighten him into telling me the truth.

. . .

Q: Tell the Judge exactly what happened with that gun as far as you can remember?

A: When I took the gun out of my purse he seen it and upon seeing I had the gun . . . he grabbed my wrist and the gun went off. I had my finger on the trigger and the gun went off.

. . .

Q: Had you intentionally aimed the gun at him prior to him grabbing?

A: No, I didn't aim it at him because no sooner I had lifted it out, he seen it and grabbed my arm.

. . .

Q: Can you tell the Court in more detail what happened with his body when you first heard that bang?

A: When he first heard the bang, he sort of turned, and in doing so, when the second shot went off, I'm trying to get my finger off the trigger of the gun when the second shot went off. I didn't even know how the thing had gone off until I heard it because I . . . was very amateur with it and about it.

Q: You did hear two bangs?

A: Yes, I did, sir.

Q: With the second bang he wasn't grabbing the gun?

A: No, sir.

Q: You were trying to get your finger off?

A: I was trying to get my finger off and the gun was like pointing downwards. I was holding it down trying to pull my finger out of where the trigger is.

Q: Mrs. Legg, at any time, the first shot or the second shot, did you point that gun at him when you pulled the trigger?

A: I never got the opportunity actually to directly point the gun at him. I just pulled it out of the purse and when he seen it he grabbed my arm. I don't even think if it was pointed at him it would be directly pointing. I don't think the gun was ever in the position at all.

*See* Trial Trans. at 158–163 (R. at 245a–250a).

In light of this testimony, trial counsel reasonably argued that the shooting was accidental and that no felony liability should ensue. Therefore, it was reasonable for counsel to decline to advance a diminished capacity defense,[4] for to do so would have been to concede felony liability and thus foreclose the strategy which was more consistent with appellant's version of events.[5]

4. Trial counsel testified that he was not aware that diminished capacity was a possible defense, due to his failure to investigate appellant's medical history. However, even if he had reviewed appellant's prior history of medical treatment, he would have had "some reasonable basis" for declining to present the diminished capacity defense in light of its inconsistency with his chosen strategy. *Cf. Commonwealth v. Dancer,* 460 Pa. 95, 101, 331 A.2d 435, 438 (1975)(as long as counsel's strategic decision had some reasonable basis designed to effectuate his client's interests, it does not amount to ineffectiveness). The majority itself properly realizes that the test is not merely whether counsel was unreasonable for failing to *investigate* the defense, but whether he also would have been unreasonable in failing to *present* the defense if he had investigated it.

5. Trial counsel's summation included an appeal to the "heat of passion" defense, but this defense was only raised as a possible defense in the event that the prosecutor's cross-examination of appellant was credited by the factfinder. Trial Trans. at 217 (Record at 304a). Immediately after raising this possibility, trial counsel concluded his own argument by stating:

I suggested to the Court that as I said before, based on her character, your mercy dispensing powers, and the fact that the shooting was not intentional, but was reflexive, that your verdict would be *involuntary manslaughter or not guilty of criminal homicide.*

In order to understand precisely how damaging the diminished capacity defense would have been to trial counsel's primary strategy, it is necessary to review the PCRA hearing testimony of Dr. Levit as to appellant's mental state at the time of the shooting.[6] Dr. Levit's testimony amply demonstrates that by presenting the defense of diminished capacity, appellant would necessarily have placed into evidence her own long-standing homicidal impulses towards the victim—evidence that would have proved ruinous to trial counsel's effort to convince the factfinder that the shooting of appellant's husband had been accidental.

Dr. Levit, in attempting to establish the framework for the defense of diminished capacity, testified with respect to appellee's admission to the Northern Communities Mental Health and Mental Retardation Center ("Northern Communities") in June of 1986, and St. John's hospital in July of 1986, several weeks before the shooting. First, Dr. Levit was asked about one of the incidents that gave rise to appellee's perception that she needed treatment:

> Q: ... [L]ooking at the St. John's report, it indicates ... that she had begun to have suicidal thoughts and that she had waited in his garage with a loaded gun and that **she intended to take his life and to turn herself in,** but that Mr. Legg had not appeared at that time ... so what comment can you offer with respect to the fact that she had apparently made this plan at a prior time ... ?

*Id.* at 218 (Record at 305a)(emphasis added). Furthermore, in suggesting that the "heat of passion" defense might be an acceptable verdict under the prosecutor's theory of the case, trial counsel did not concede the issue of general criminal liability, as he necessarily would have by arguing diminished capacity. *See Commonwealth v. Travaglia, supra, Commonwealth v. Walzack, supra.* Thus, the fact that voluntary manslaughter was available and was argued as a possible defense verdict does not in any way implicate counsel's reasonableness in declining to pursue a defense of diminished capacity as well.

**6.** Dr. Levit, a psychologist who testified on appellant's behalf at the PCRA hearing, had no contact with appellant until over five years after the events at issue. He relied on his interpretations of behavior clinic reports, reports from St. John's Hospital, discovery material, and belated psychological tests that he performed on appellant in forming his opinions. *See* Notes of Test. at 10 (Record at 328a).

A: I account for that on the basis that she was a depressed, angry, anxious woman who felt extremely betrayed and frustrated and rejected....

N.T. at 39–40 (R. at 357a–358a). With respect to appellee's subsequent admission and treatment at St. John's and Northern Communities, Dr. Levit testified as follows:

Q: In your report—if I can interrupt for one second, Dr. Levit, in your report on page two there ·is, I believe, a correction that needs to be made. You have in the report that she was hospitalized in St. John's in July of 1986?

A: This is what Mrs. Legg remembers ... She was also talking homicide then. **And I don't understand why the hospital did not warn her husband.** They should have some responsibility to do that.

N.T. at 14 (R. at 332a).

Q: Looking at the Northern Communities reports on that first page, she indicates there, also, that she had a club with her and planned to assault him in the parking lot but that he didn't show up. So we have another instance where she had apparently intended to cause severe harm to her husband but ... he didn't show up.

A: **There is no question that she had homicidal feelings toward her husband.** That is well documented. But if you want to look at it from what—as an oxynervon, psychologically valid, if this was an intentional, volitional act, it would not—there would not have been an argument. She would have went over and shot him.

N.T. at 39–40 (R. at 357a–358a).

Dr. Levit's analysis of the treatment reports, which would necessarily have been placed in evidence for purposes of the putative diminished capacity defense, would have been catastrophic with respect to trial counsel's attempt to portray the shooting as accidental. The treatment reports revealed a long-running history of appellant's homicidal urges frustrated only by her inability to carry them out. Regardless of whether this psychological history arguably supported a diminished

capacity defense,[7] its introduction at trial would clearly have subverted the strategy of portraying the shooting as a complete accident. Instead, this history would have provided additional fodder for the Commonwealth to show that the shooting was premeditated and was, in fact, first-degree murder.

Even more damaging than Dr. Levit's testimony with respect to appellant's psychological history was his testimony with respect to her state of mind at the exact time of the shooting. Dr. Levit testified as follows with respect to appellant's emotional response on the day of the shooting to the harassment charges filed that day by the other woman whom appellant believed was involved romantically with the victim:

Q: Now, you have indicated that it was a culmination of the more recent events which had occurred which ultimately essentially sent her over the edge and caused her this great anxiety which ultimately resulted in her husband's death; is that right?

A: That's correct.

. . .

Q: [But] we don't know in fact whether that [the filing of the harassment charges] was the final thing that caused her to actually shoot him, or whether had he shown up at either of these two prior occasions he . . . could also have been killed?

A: The only thing we know for sure is that on that specific date, August 8 of 1986, that he was killed as the final aspect of this particular relationship, with the escalation of all these feelings.

Q: Now, when you say she would not have had the capacity to understand what was going on on that particular day, or that her judgment was impaired, how do you believe she perceived the events which occurred? Did she perceive that, in fact, it was an accident and during the argument and ensuing struggle that the gun went off, or did she

7. As explained *infra,* neither this testimony nor the remainder of Dr. Levit's testimony supports a diminished a diminished capacity defense.

perceive that she did shoot him but she didn't know what she was doing when she did it?

A:    What Mrs. Legg told me when I examined her was that it was an accident.  **Now, whether in fact this was an accident or an essentially irrational moment, this happened wrong, none of us will ever know.**

*Id.* at 44–45 (R. at 362a–363a)(emphasis added).

Dr. Levit's testimony clearly undercuts appellant's account of the shooting as accidental, as he acknowledges that she had been pushed "over the edge" and concludes by stating that he is not even sure whether he believes the veracity of appellant's own testimony that the shooting was accidental.  A factfinder could very well have decided, based on this testimony, that the shooting was the ultimate fulfillment of her homicidal urges which had been growing for a period of several months.   In any event, a factfinder would certainly have been even *less* likely to decide that the shooting was accidental, given the reluctance of appellant's own expert to give unflagging support to her account in this regard.   In fact, a compelling claim of ineffective assistance of counsel could have been advanced in this case if trial counsel *had* attempted to present a diminished capacity defense while simultaneously attempting to seek a verdict of involuntary manslaughter.

The majority notes that the evidence adduced at trial could have supported five separate verdicts—first-degree murder, third-degree murder, voluntary manslaughter, involuntary manslaughter and acquittal.   The majority concludes that "[p]articularly when the facts supported a finding of first-degree murder, we find no reasonable justification for counsel's failure to also advance a diminished capacity defense that may have produced a verdict of third-degree murder."   The existence of first-degree murder as a possible verdict is quite simply irrelevant in determining whether trial counsel reasonably declined to advance a diminished capacity defense.   The relevant question is whether the alternatives that trial counsel *did* in fact pursue, and which necessitated the rejection of certain other inconsistent alternatives, were reasonable.   For the reasons stated, I believe that the strategies pursued in this

case, based on appellant's own version of events and aimed at obtaining misdemeanor liability at worst, were indeed reasonable.[8]

Although I dissent primarily on the basis of my disagreement with the majority as to whether trial counsel acted reasonably in not presenting a diminished capacity defense, I would be remiss if I failed to address the majority's determination under the third prong of the ineffectiveness test—that the alleged unreasonableness "so undermined the trial that the verdict is unreliable." *See Commonwealth v. Szuchon*, 534 Pa. 483, 633 A.2d 1098 (1993). Under this prong, appellant must establish by a reasonable probability that but for the act or omission on question, the outcome of the proceeding would have been different.[9] *Commonwealth v. Lark*, 548 Pa. 441, 698 A.2d 43, 47 (1997). Thus, appellant is required to establish by a reasonable probability that the diminished capacity defense would have proven successful if trial counsel had advanced it.

**8.** The majority also alludes to the PCRA hearing testimony of trial counsel, who, when asked whether he would have proceeded differently had he known that appellant suffered from major depression, replied, "Absolutely. First [sic] comes to mind is the defense of diminished capacity, if that can be developed." Maj. Opin. at 11. Trial counsel's self-interested testimony in support of a new trial for his former client, while somewhat suspect, is nevertheless irrelevant. The inquiry is not whether he would have acted differently under a subjective test, but whether he in fact acted reasonably in the first instance under an objective standard. For the reasons stated above, I believe that he did.

**9.** To some extent, analysis of whether there was actual prejudice will inevitably dovetail with analysis under the first prong of the ineffectiveness test, whether the underlying claim is of "arguable merit." In this vein, the majority points out that, based on Dr. Levit's testimony, the Commonwealth has stipulated that the diminished capacity defense was of "arguable merit." However, the issue of whether certain testimony, if credited, supports a defense of diminished capacity is a question of law. This Court is not bound by stipulations as to questions of law. *See Matter of Green*, 470 Pa. 164, 368 A.2d 245 (1977); *Miller v. Commonwealth*, 498 Pa. 103, 109, 445 A.2d 88, 91 (1981)(Roberts, J., dissenting)(citing *Sanford's Estate v. C.I.R.*, 308 U.S. 39, 51, 60 S.Ct. 51, 59, 84 L.Ed. 20 (1939)). Therefore, the stipulation of the parties that the underlying issue is of arguable merit has no preclusive effect in our determination as to whether appellant suffered prejudice through trial counsel's failure to advance the underlying claim.

The only testimony advanced in support of the diminished capacity defense at the PCRA hearing was that of Dr. Levit. Therefore, we must determine whether this testimony would likely have established the defense of diminished capacity. Even upholding the PCRA court's finding that Dr. Levit's testimony is to be fully credited, the testimony itself fails to support the legal conclusion that appellant suffered from diminished capacity as that term is properly understood in our jurisprudence.

The defense of diminished capacity can only be established if the proponent proves that at the time of the killing, he was suffering from a mental disease, illness or delusional mental state that wholly precluded the cognitive functions of planning, premeditation and deliberation. *See Commonwealth v. Terry [II],* 513 Pa. 381, 394, 521 A.2d 398, 404 (1987); *Commonwealth v. Terry [I],* 501 Pa. 626, 631, 462 A.2d 676, 679 (1983). *See also Commonwealth v. Zettlemoyer,* 500 Pa. 16, 28, 454 A.2d 937, 943 (1982)(psychiatric testimony must speak to overall inability to formulate or carry out a plan or design; such testimony is irrelevant to a diminished capacity defense if it only goes to defendant's irresistible impulse with respect to the particular crime). Neither social maladjustment, lack of self-control, impulsiveness, psycho-neurosis, emotional instability, chronic malaria, "irresistible impulse," nor all of such conditions combined, bear upon the narrow and extremely limited defense of diminished capacity. *See Zettlemoyer, supra,* at 38, 454 A.2d at 948. *See also United States v. Pohlot,* 827 F.2d 889, 903 (3d Cir.1987)(only in the most extraordinary circumstances does a defendant actually lack the capacity to form *mens rea* as it is normally understood in American law; even the most psychiatrically ill have the capacity to form intentions, which satisfies the *mens rea* requirement).

Dr. Levit's questionable testimony, even if credited, supports at most the legally incognizable "irresistible impulse" defense. For example, the following exchange occurred when Dr. Levit was asked why appellant was able to seek treatment for her own homicidal ideations if she was incapable of forming the specific intent to commit murder:

Q: Could you explain for the Court why in two months prior to the homicide she was able to prevent or to seek care for her homicidal ideations?

A: I can try. The series of events will be escalating. This is not unusual in this kind of situation. The charges of harassment occurred during this two-month period of time which further intensified her frustration and her hostility, her anger. She knew that she was a very angry person. **She knew she was thinking of suicide and homicide.** The part of her thinking which was still reasonable wanted to prevent these ... but during this two-month period the whole emotional tone built up and kept escalating. She kept preoccupying herself with these feelings, these thoughts, the depression, anxiety.

This testimony simply does not convey that appellant suffered from the inability to formulate the requisite mental state and to "carry out a plan or design." *See Zettlemoyer, supra,* 500 Pa. at 28, 454 A.2d at 943. Rather, it conveys that her formulation of that mental state may have been due to factors of which she was fully aware but that were, according to Dr. Levit, beyond her ability to control. Even more revealing is the following exchange:

Q: Now, I want to call your attention to ... Miss Legg['s] ... chief complaint [in the St. John's hospital records] that, **"I need to be locked up or else I will be in jail."** ... Is it consistent with someone who is experiencing the type of disorders that she was experiencing to have some awareness of her emotions and feelings and impulses?

A: Oh, yes, it is. Mrs. Legg was not psychotic. She knew what was happening. **She couldn't particularly control it, but she knew what was going on and it frightened her.**

*See* N.T. at 21 (R. at 339a).

The inability to control one's actions is simply not a defense to the charge of murder in this Commonwealth. This Court has always diligently stood guard against the sometimes ingenious attempts by defense counsel to infiltrate our jurisprudence with the "irresistible impulse" defense in the guise of

diminished capacity. *See, e.g, Commonwealth v. Zettlemoyer, supra,* 500 Pa. at 28, 454 A.2d at 943. The Court drops its guard today, and allows itself to be swayed by the insupportable *legal* conclusions drawn by a psychologist, as is further evidenced by the following exchanges:

Q: Could you explain to the Court what, if any, effect a person's major depression and anxiety would have on their ability to perceive, especially the series of events within the last year?

A: There would be a distortion in perception. There would be swings, perhaps, of mood. Judgment would intermittently be impaired ... When the charges of harassment came, when the other problems started building up, just in the last couple of weeks, this was much more devastating than what had happened before. This was a very sharp escalation which caused her significantly more pain, more anger, more feelings of betrayal and anxiety and more depression. And it intensified both the suicidal and homicidal feelings.

*See* N.T. at 29–30 (R. at 347a–348a). "Swings of mood," "distortions of perception," "impaired judgment," "anxiety," and "depression" are not mutually exclusive with the commission of first-degree murder. Nor is the experience of an "escalating" life stressor that "intensifies homicidal feelings." Even more revealing is Dr. Levit's testimony concerning appellant's psychological response to appellant's argument with her husband in the automobile which immediately preceded the shooting:

Q: ... [T]he two of them argued [in the car] about whether he was continuing to see Amy Stevenson. And in her testimony she said that he lied to her and denied that he was seeing her ... how would a person who is experiencing psychological distortions respond to that particular stimuli?

A: With a great deal of anger, with a great deal of frustration. With, again, intensified feelings of betrayal. With a lot of anxiety and a lot of depression. This was just sort of the last straw.

. . .

Q: Would a person who is experiencing this condition have an ability at that time that they were in the car together arguing to coolly reflect upon her behavior?

A: Absolutely not.

Q: Why not?

A: Because she was sufficiently upset and agitated at that time that when you look at this through the eyes of severe depression, anxiety, et cetera, all the anger that goes with them, her judgment was significantly impaired in my opinion and she simply was not able to formulate that kind of intent.

N.T. at 30–31 (R. at 348a–349a),

This exchanges reveals the fundamental misunderstanding that defense counsel, Dr. Levit, the PCRA court, and a majority of this Court share with respect to the concept of specific intent. Appellee did not need to be able to "coolly reflect on her behavior" in order to be convicted of first-degree murder. The only mental abilities she needed to possess were the ability to understand the natural consequence of shooting someone twice at close range and the ability to specifically intend to pull the trigger while possessing this understanding. Dr. Levit's testimony does not in any way negate either of these abilities.[10]

---

**10.** Dr. Levit testified similarly at a subsequent point in the hearing, after the Court asked him why he believed that appellee could not formulate the specific intent to kill:

> Because at that time the combination of her symptoms was sufficiently intense that her judgment was markedly impaired, that her reasoning and thought process and abilities had essentially been suspected, and that she could not in my opinion formulate *rationally* this kind of intent.

N.T. at 49 (R. at 367a)(emphasis added). Again, it would be virtually impossible to secure a conviction for first-degree murder if the prosecutor had to prove that the accused's specific intent to commit the murder had been *rationally* formulated. In a very real sense, it is never a rational thought process that causes someone to formulate the intent to take a life. However, a rational thought process is not a prerequisite to the ability to form a specific intent in our legal system. *See, e.g., United States v. Pohlot,* 827 F.2d 889, 903 (3d Cir.1987)(only in the most extraordinary circumstances does a defendant actually lack the capacity to form *mens rea* as it is normally understood in American law; even

Moreover, appellee's own treatment records, revealing that she had lain in wait on prior occasions *specifically intending* to kill her ex-husband and that she understood that she was fully capable of killing him, demonstrate quite convincingly that she possessed the ability to formulate the specific intent to commit murder. Attempting to account for these instances, Dr. Levit testified:

> There is no question that she had homicidal feelings towards her husband. That is well documented. But if you want to look at it from what—as an oxynervon, psychologically valid, if this was an intentional, volitional act, it would not—there would not have been an argument. She would have went over and shot him ... she had well over a year in which she could have killed this man if there was true intent.

N.T. at 39–40 (R. at 357a–358a). This striking bit of illogic apparently purports to establish that the lapse of over one year between the first hatching of a plan and its final culmination negates the possibility that the execution of the plan was intentional if the killing *could* have culminated at some earlier time. The doctor proceeds to reason his way to the remarkable conclusion that intentional murders are categorically not preceded by arguments, apparently since he believes that no murderer would want to waste time arguing if the murderer already intended to kill the victim.[11] The unstated belief that seems to drive this conclusion by Dr. Levit is that all true first-degree murderers necessarily effectuate the termination of their victim in the most expeditious and efficient manner possible. Under the doctor's flawed reasoning, failure to kill in such a "professional" manner must therefore mean that the killer lacked a true intent to kill. I would find this reasoning amusing were it not for the fact that a majority of this Court evidently accepts that this peculiar logic tends to successfully establish the defense of diminished capacity. Thus, the only proper reaction is alarm, since it seems as though, under this

the most psychiatrically ill have the capacity to form intentions, which satisfies the *mens rea* requirement).

11. The logical possibility that an argument can itself trigger the specific intent to kill escapes Dr. Levit's legal analysis.

logic, any slaying that does not bear the indicia of a dispassionate, "professional"-type assassination will now be a likely candidate for a successful diminished capacity defense in this Commonwealth.

An exposition of Dr. Levit's testimony would be incomplete if it did not include reference to the excerpt that most tellingly reveals his misunderstanding of the legal concept of diminished capacity. The PCRA court asked Dr. Levit, who had not read the trial transcript, about appellant's admission at trial that she had removed the gun with the specific intent of frightening the victim into telling the truth, and how this admission related to her ability to formulate other intentions, such as the intention to commit murder. The following dialogue ensued:

THE COURT: Assuming that [this] statement was made during the course of the trial, how does that bear upon what her state of mind might have been prior to actually confronting her husband ... ?

DR. LEVIT: I think, again, from my point of view, trying to get someone to tell you the truth, trying to intimidate someone to be honest with you when you are feeling so angry, so depressed, so betrayed by that specific individual is totally different from wanting to kill them. This is a totally different situation. I can go window shopping and have no intent to buy.

THE COURT: You oftentimes wind up buying anyway?

DR. LEVIT: That is true, but without intent.

*See* N.T. at 53 (R. at 371a).

Assuming for the moment that it is true that people often purchase things without having formulated the specific intent to do so—a concept which I find mystifying, unless perhaps the doctor is making reference to shoppers who are hypnotized or perhaps sleepwalking—this testimony vividly reveals Dr. Levit's fundamental misunderstanding, in a *legal* sense, of the defense that his testimony purports to establish. Dr. Levit's psychobabble evidences his belief that, from a legal standpoint, appellant's ability to formulate the specific intent

to intimidate someone with a gun for an articulated reason is irrelevant in determining whether appellant could further formulate the specific intent to cause that person's death. Quite to the contrary, however, this Court has repeatedly emphasized that the defense of diminished capacity is an extremely limited one that requires a defendant to establish that, at the time of the murder, one's ability to specifically deliberate and to carry out a plan was categorically negated by one's mental illness. *See Terry [II], supra,* 513 Pa. at 394, 521 A.2d at 404; *Terry [I], supra,* 501 Pa. at 631, 462 A.2d at 679 (1983); *Zettlemoyer, supra,* 500 Pa. at 28, 454 A.2d at 943 (1982). Dr. Levit's testimony does not explain or attempt to explain how, at the time of the shooting, appellant mysteriously lost her deliberative faculties and planning abilities which she possessed mere seconds before she killed her husband. Therefore, appellant cannot possibly prove by a reasonable likelihood that her deliberative faculties had indeed abandoned her at the moment of the shooting. Consequently, appellant has failed to meet her burden of establishing prejudice for purposes of the PCRA.

In sum, trial counsel acted quite reasonably in foregoing a diminished capacity defense in order to pursue a verdict of either involuntary manslaughter or acquittal, since the diminished capacity defense was patently inconsistent with these more desirable defenses that appellee's own testimony supported. Even if counsel had not acted reasonably, appellant would not thereby have suffered any prejudice, since a diminished capacity defense would not have proven availing on this record. Thus, under the relevant PCRA standards governing ineffective assistance of counsel claims, collateral relief in this matter is clearly not warranted.

Lastly, it is necessary to point out the effect that today's decision by the majority could have in upsetting fairly won convictions for first-degree murder in the future. By the majority's reasoning, any first-degree murder convict is entitled to a new trial when he can establish three facts: (1) that trial counsel was aware, or should have been aware, that a defendant had a medical history that included psychological

problems; (2) that trial counsel neglected to present a diminished capacity defense, even if it would have conflicted with a defense that was reasonably presented; and (3) that a psychiatrist has concluded at a PCRA hearing that based on a review of the record and personal meetings, the appellant could not have formulated the required specific intent at the time of the murder. I fear that these three factors will henceforth converge with alarming frequency in PCRA petitions. Moreover, by stretching the defense of diminished capacity to encompass the facts of this case, the majority has, perhaps inadvertently, set a precedent which will allow defendants to raise the defense of "the devil made me do it" to charges of first-degree murder. I do not believe that the particular facts of this case warrant the upheaval of the law of diminished capacity in the Commonwealth. Therefore, I dissent.

NIGRO and SAYLOR, JJ., join this dissenting opinion.